James RUSSELL, Appellant,

v.

The STATE of Texas, Appellee.

No. 60412.

Court of Criminal Appeals of Texas, En Banc.

March 12, 1980.

Rehearing Denied April 23, 1980.

2. *Stodghill v. Texas Employers Insurance Association,* 582 S.W.2d 102 (Tex.1979).

242

C. C. Divine, Houston, for appellant.

William A. Meitzen, Dist. Atty., Fred M. Felcman and Thomas R. Culver, III, Asst. Dist. Attys., Richmond, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

W. C. DAVIS, Judge.

This is an appeal from a conviction for capital murder. The jury answered affirmatively the special issues submitted under Article 37.071, Vernon's Ann.C.C.P. Accordingly, the punishment was assessed at death.

In view of the various grounds of error raised by appellant, a detailed recitation of the evidence is necessary. The record reflects that appellant kidnapped, sexually abused and murdered the complaining witness against him in a pending robbery case.

Diana Stearns, wife of the deceased, Thomas Stearns, testified that on March 19, 1974, her husband left for work at around 8:45 a. m. The deceased was employed at a Radio Shack. He never arrived at work that day, nor did his wife ever see him again. Two days later, his car was found abandoned, with the tape deck missing.

Lloyd Harris [1] testified that he was jointly indicted with appellant for the capital murder of Thomas Stearns. He agreed to testify against appellant in exchange for a reduction of the charge. Harris testified that he and "Sugar Man," as appellant was known, and Delores Ann Smallwood all spent the night together in a motel on the night of March 18, 1974. They got up around 7:30 a. m., dressed, and left the motel in appellant's brother's car, which was a beige and brown 1972 Monte Carlo. Appellant was driving. The three headed south and turned into an apartment complex, where appellant parked the car and got out. Harris and Smallwood stayed in the car. At this time, appellant had on him a small black pistol, which had been purchased by appellant and Harris.

After a period of time, appellant reappeared from the apartment complex, walking with a "dude," whom Harris identified as the deceased. Harris observed appellant get into the deceased's car on the driver's side. He then observed appellant say something to the deceased, at which time the deceased got down on the floor of the car. The two cars then drove off, with appellant driving the deceased's car and Harris following in the Monte Carlo, pursuant to appellant's instructions.

Appellant stopped one time and told Harris that the pistol had jammed. After it was fixed, they continued. After reaching a somewhat rural area, the two cars stopped. Appellant got out of the deceased's car and forced the deceased to do the same. He then forced the deceased into the trunk of the Monte Carlo. Harris testified that appellant then took something which looked like a radio out of the deceased's car, and then got a rag, and started wiping off the steering wheel, door handle, and wherever he had touched the deceased's car.

Appellant then drove the Monte Carlo, with the deceased in the trunk. They stopped once at a service station. Harris testified that the deceased was making some noise in the trunk, and that appellant went around and said to the deceased "shut that damned noise up before I come back there and do something to your ass."

Appellant then drove out to a rural area in Fort Bend County and stopped the car. He got out, taking his pistol with him, and unlocked the trunk. Harris testified that appellant was talking to the deceased about having smoked some cigarettes in the trunk. Harris testified that he asked appellant what was going on, to which appellant replied, "This is the son of a bitch that is going to testify against me on that robbery case." Harris testified that he had previously thought that he and appellant had been going to "score some heroin." He stated that he called to appellant several times concerning what appellant was going to do, and that he tried to persuade appellant to leave the deceased alone. Harris stated that appellant told him that he had to "take care of this business here;" appellant kept telling Harris to mind his own business.

Appellant, with the pistol, then took the deceased off into the woods. Harris testified that he heard the deceased say one time, "Don't. Don't kill me." Later, he heard two shots. After a few minutes, appellant came out of the woods and approached the car, where Harris and Smallwood were sitting. As appellant approached the car, he threw up both arms, with one fist clenched and the pistol in the other, and said, "Goddamn it, I am free at last. All of my troubles are over."

According to Harris, appellant got into the car and began laughing. Harris stated that no one spoke, but that appellant kept on laughing and turned the music up loud, and then said, "Man, I really misused that motherfucker. I made a bitch out of him before I killed his ass." Appellant then took Harris and Smallwood to their respective homes. Harris stated that later, the pistol was thrown into Oyster Creek.

Delores Ann Smallwood, 21 years old at the time of trial, testified that she had been in the car with Harris and appellant. She

1. Harris was frequently referred to as "Sonny," which was his "street name."

testified to essentially the same facts as Harris, and stated that when appellant had taken the deceased off into the woods, she had remained in the car, very frightened. After she heard the shots and appellant returned to the car, Smallwood testified that appellant exclaimed, "Man, I made that motherfucker suck my dick and I pissed in his mouth."

Various police officers testified that on April 10, 1974, the decomposing body of the deceased was found, with some of his personal effects strewn around the body. The deceased's trousers were down around his knees and his underwear was down below his buttocks. Two bullet hulls and one slug were found at the site of the body.

Dr. Joseph Jachimczyk, Chief Medical Examiner of Harris County, testified that an autopsy was performed on the body of the deceased. Four bullet holes were found in the deceased's skull; an entrance and exit wound on each side of the head. Jachimczyk testified that the cause of death was these two gunshot wounds to the head.

Over the objection of appellant and after admonishments from the trial court to the jury that the following evidence was admitted only to show motive, Ken Sparks, Assistant District Attorney of Harris County, testified that in late 1973, he handled a robbery by assault case involving appellant. Sparks testified that Thomas Stearns, the deceased, had allegedly been robbed by appellant.

On February 20, 1974, appellant had appeared in court with his attorney, Gerald Goynes. At this time, the State and the defense entered into plea negotiations concerning the robbery. Papers were executed pursuant to an agreement reached, and a stipulation of evidence and waiver of a jury trial were signed by Goynes. Sparks testified that he observed appellant going through the motions of signing these documents, but that he did not actually see appellant sign his name. However, State's Exhibit # 10, the stipulation and waiver, which bore appellant's signature, were introduced into evidence. Gerald Goynes, appellant's former attorney, testified over appellant's objection, that he (Goynes) did not forge appellant's name to the sworn documents. The case was then reset for a plea of guilty on March 20th.

On March 20th, the day after the disappearance of the complaining witness, but before his body was found, appellant appeared in court with counsel and changed his plea to the robbery to "not guilty" and demanded a jury trial.

Police Officer Ernest Taylor testified that in January of 1977, the Monte Carlo which had belonged to appellant's brother was located in San Antonio. On the inside lid of the trunk, next to the inside locking mechanism, he found a black smudge mark, which was later found to be soot. Taylor testified that he duplicated the mark by striking a match and holding it against the inside lid of the trunk. Taylor also took samples from the car of the black weatherstripping inside the trunk, which looked like it could have had fingernail scratch marks in it.

There was also testimony that a small black pistol was recovered from Oyster Creek. Officer G. E. Martinez, a firearms examiner, testified that he performed tests on this gun. As a result of his tests, he concluded that the two bullet hulls found at the scene of the murder had been fired from the gun recovered in the creek.

Appellant presented a defense of alibi. Several of his family members testified that on the date of the offense, he was at home. Appellant also testified in his own behalf and denied the commission of the offense.

In rebuttal, the State offered the testimony of Fred Hewitt, an acquaintance of appellant. Hewitt testified that in late March of 1974, he was riding with appellant in the Monte Carlo, going to get some "coke." Hewitt testified that appellant had said that "a dude could recognize him (appellant) and send him to the penitentiary," and that he (appellant) had killed the man who had worked in a radio shop. According to Hewitt, appellant had also stated that he had "killed the white son of a bitch and made him suck his dick." Hewitt also stat-

ed that at a later date, he had been incarcerated in the Harris County Jail with Harris and appellant, and that appellant expressed concerns that Harris had "give him up" or implicated him to the authorities.

In his fifteenth ground of error, appellant contends that the trial court erred in refusing to grant his motion for an instructed verdict, as the circumstantial evidence was insufficient to support a conviction. Specifically, he contends that the State failed to prove the corpus delicti of the crime, in that the evidence is insufficient to show that the death of the deceased was caused by the criminal act of another. See *Shannon v. State*, 567 S.W.2d 510 (Tex. Cr.App.1978); *Easley v. State*, 564 S.W.2d 742 (Tex.Cr.App.1978); *Self v. State*, 513 S.W.2d 832 (Tex.Cr.App.1974). He bases this contention on the fact that Dr. Jachimczyk, in testifying on cross-examination as to the cause of death of the deceased, stated that he could not tell whether the gunshot wounds were accidentally caused or otherwise. We find no merit in this contention.

In *Shannon v. State*, supra, we reiterated that one element of the corpus delicti in a murder case is that the death of the deceased must be shown to have been caused by the criminal act of another. See also, *Easley v. State*, supra; *Self v. State*, supra. In the instant case, the body of the deceased was found in a secluded rural area, some weeks after the deceased had disappeared. The cause of death was two gunshot wounds through the head, one on each side. The deceased's trousers and underwear were found pulled down below his buttocks, and his personal effects were found around the body. Some of the deceased's personal effects were missing and were never recovered. We hold that the evidence is sufficient to show that the Stearns death was caused by a criminal act; thus, the evidence is sufficient to establish this element of the corpus delicti in this case. See *Shannon v. State*, supra; *Easley v. State*, supra; *Self v. State*, supra. This ground of error is overruled.

In his first ground of error, appellant contends that the Texas death penalty statute is unconstitutional. Specifically, appellant attacks Article 37.071(b)(2), Vernon's Ann.C.C.P., as being arbitrary, vague, and as permitting jurors to exercise unbridled discretion in answering this special issue. This contention has previously been answered adversely to appellant. See *Brown v. State*, 554 S.W.2d 677 (Tex.Cr. App.1977); *Collins v. State*, 548 S.W.2d 368 (Tex.Cr.App.1977); *Livingston v. State*, 542 S.W.2d 655 (Tex.Cr.App.1976); *Gholson v. State*, 542 S.W.2d 395 (Tex.Cr.App.1976); *Jurek v. State*, 522 S.W.2d 934 (Tex.Cr.App. 1975), affirmed sub nom. *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). This ground of error is overruled.

In his second ground of error, appellant contends that he was "deprived [of] a fair trial by an impartial Jury by persons who favored the death penalty as punishment for the conviction of crime." In one ground of error appellant complains of the exclusion of six prospective jurors. This ground of error is multifarious and not in compliance with Article 40.09, Sec. 9, Vernon's Ann.C.C.P. Therefore, nothing is presented for review, However, in the interest of justice, we shall review appellant's complaint.

In *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the Supreme Court of the United States stated:

"Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected."

The Court further stated:

"Unless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position."

In *Davis v. Georgia*, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976), the Court reaffirmed the *Witherspoon* doctrine. See also, *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Maxwell v. Bishop*, 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed.2d 221 (1970); *Boulden v. Holman*, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969).

 Appellant's first complaint is directed at the trial court's action in sustaining the State's challenge for cause to venireman James Ober. Ober stated that he had religious or conscientious scruples against the infliction of the death penalty, and that he had been against capital punishment most of his life. The prosecutor asked:

"Q. You can't conceive of any case that would be so horrible that you personally could vote for the death penalty under any circumstances?

A. [Ober]: No. I don't believe I could.

\* \* \* \* \* \*

A. . . . . It's just the fact of taking another man's life. I don't believe it's right to decide to take a man's life.

\* \* \* \* \* \*

A. . . . . I would weigh the evidence and reach a verdict, but, I mean, how many times do I have to say that I don't believe in sending a man to his death?

Q. Well, you have got to say it a little stronger than that, that you couldn't consider it under any circumstances—you couldn't give the death penalty.

A. No. I couldn't consider it because I think it's wrong.

\* \* \* \* \* \*

Q. [Defense Counsel]: You just couldn't do it under any circumstances?

A. No. Because my sense of decency and fair play has nothing to do with my senses. I do not believe that we have a right to judge whether another man lives or dies."

When the trial court sustained the State's challenge for cause to Ober, appellant voiced no objection. The failure to object waives any error. See *Burks v. State*, 583 S.W.2d 389 (Tex.Cr.App.1979) (On Motion for Rehearing); *Hughes v. State*, 562 S.W.2d 857 (Tex.Cr.App.1978); *Shippy v. State*, 556 S.W.2d 246 (Tex.Cr.App.1977); *Boulware v. State*, 542 S.W.2d 677 (Tex.Cr.App.1976). However, even if appellant had preserved error here, the record *clearly* reflects that Ober was disqualified under the doctrine of *Witherspoon*. This contention is overruled.

 Appellant next complains of the trial court's excusing Jerry Matthews, James Craven and Jerry Wade. Upon examination of the record, it appears that the State exercised three peremptory challenges to strike these jurors. Appellant's contentions are without merit. See Article 35.14, Vernon's Ann.C.C.P.; compare *Duncantell v. State*, 563 S.W.2d 252 (Tex.Cr.App.1978); *Ridley v. State*, 475 S.W.2d 769 (Tex.Cr.App.1972).

 Appellant next complains of the trial court's action in sustaining the State's challenge for cause to prospective juror Tommy Kostelnik. Upon examination by the State, Kostelnik first stated that he had conscientious scruples against the infliction of the death penalty. He then continued:

"A. . . . I don't know whether I could live with that, you know, sending another human being to his death. I just don't know.

\* \* \* \* \* \*

Q. [Prosecutor]: I said, could you imagine one [murder case] that didn't involve you or any member of your family, so bad, such a horrible murder case that you could vote the death penalty if you was (sic) called upon to do so.

A. Just myself?

Q. Uh huh . . . you.

A. No. I couldn't do that.

\* \* \* \* \* \*

Q. You have got to vote. I said, Could you vote for it?

A. No. I have got to stick by my—No. I couldn't.

Q. [Defense Counsel] . . . See, you would have to bear in mind that the fate of this man would be what you want it to be as a member of the jury. You would join with the other 11 members in deciding his fate, whether he lives or dies. You could do that, couldn't you? . . or could you?

A. Whether he dies? No.

Q. . . . Would you follow the law and vote yes if you believed beyond a reasonable doubt that these two issues—these two questions—if you believed them fully beyond a reasonable doubt as they applied to him? And you have a right to your own beliefs. Nobody can criticize you for it. But we have a right to know about it.

A. Well, I guess I just don't believe in capital punishment."

When the trial court excused Kostelnik, appellant voiced no objection thereto. See *Burks v. State*, supra; *Hughes v. State*, supra; *Shippy v. State*, supra; *Boulware v. State*, supra. Thus, no error is preserved for review. Nevertheless, we note that as we have previously stated, *Witherspoon* does not require formal answers. See *Villarreal v. State*, 576 S.W.2d 51 (Tex.Cr.App. 1979); *White v. State*, 543 S.W.2d 104 (Tex. Cr.App.1976). Upon review of this "cold record," it appears to this Court that this venireman was disqualified under *Witherspoon*. Kostelnik never equivocated in his opposition to the imposition of the death penalty, and the import of his testimony is that he would always be unable to vote for the infliction of such a severe penalty. Appellant's contention is overruled.

■ Appellant next contends that the trial court erred in excusing prospective juror Peggy Ryan, after the State's challenge for cause. Upon being asked whether she had religious or conscientious scruples against the infliction of the death penalty, Ryan stated:

"A. I really,—I really don't feel that I could live with myself if I would come to this conclusion or decision. I really don't feel like I could handle it.

Q. [Prosecutor] Is this a long-held feeling? . . . have you felt this way quite a number of years?

A. I really have.

* * * * * *

Q. You really wouldn't want to send a man to his death?

A. Right.

Q. . . . or participate in it?

A. I really wouldn't.

Q. Can you personally conceive of a case so horrible—not this case, but just dream one up that doesn't involve you or any members of your family—your close family members—that would be so horrible that you could vote the death penalty directly if you was (sic) called upon to do it?

A. I really don't think I could, due to the fact—maybe I don't need to explain it, but I just—I don't know—I just don't think I could."

The record reflects that appellant did not object when this juror was excused nor did he even request to examine her. As such, this failure to object waives any error. See *Burks v. State*, supra; *Hughes v. State*, supra; *Shippy v. State*, supra; *Boulware v. State*, supra. Even though error is not preserved for review, we note that the record supports the conclusion that this prospective juror was disqualified under the doctrine of *Witherspoon*. Appellant's second ground of error is overruled.

In his third ground of error, appellant contends that he was unlawfully denied his right to a speedy trial. The record in this cause reflects that the indictment charging appellant with capital murder was filed February 17, 1977. The murder was alleged to have been committed on March 19, 1974. Appellant's pro se motion to dismiss for the denial of a speedy trial was overruled October 21, 1977. Trial commenced on November 15, 1977.

Appellant is correct that the right to a speedy trial is guaranteed by the Sixth Amendment to the United States Constitution as applied through the Fourteenth Amendment. *Klopfer v. North Carolina*, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967); *Smith v. Hooey*, 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969); *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The same right is assured by Article I, Section 10 of the Texas Constitution and Article 1.05, Vernon's Ann.C.C.P.

The determination of whether an accused has been denied the right to a speedy trial is to be made by use of a "balancing test" which was set out in *Barker v. Wingo*, supra. In each individual case, the Court requires consideration of the following factors: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the right; and (4) the prejudice to the defendant resulting from the delay. See also, *Moore v. Arizona*, 414 U.S. 25, 94 S.Ct. 188, 38 L.Ed.2d 183 (1973); *Grayless v. State*, 567 S.W.2d 216 (Tex.Cr.App.1978); *Carney v. State*, 573 S.W.2d 24 (Tex.Cr.App.1978); *Turner v. State*, 545 S.W.2d 133 (Tex.Cr.App.1976).

The record before this Court reflects a delay of only nine months between indictment and trial. In a prosecution for a capital offense where the State is seeking the death penalty, it is questionable whether this length of delay is substantial enough to trigger an inquiry into the other factors involved in a review of a speedy trial claim. See *Barker v. Wingo*, supra. However, even if this length of delay is sufficient to trigger further inquiry, we hold that appellant has failed to show that he was denied his right to a speedy trial.

Appellant offered no proof on the allegations contained in his pro se motion to dismiss the indictment. In this motion, which bears no file marks indicating when it was filed in the trial court, appellant contends that he was indicted for this capital offense in May of 1974. This contention is not supported by the record before this Court, as only one indictment is contained therein,

and it is dated February 1977. However, even if appellant's assertion is correct, he has still failed to show how he was denied a speedy trial in this cause. The record does not reflect any reasons or lack thereof for any delay in bringing him to trial, nor does it indicate in any way that appellant was prejudiced thereby. The record does indicate that during the time which elapsed between the instant offense of capital murder and his trial therefor, he was held, and tried, and convicted on a robbery charge in another county. There is also some indication in the record that sometime during this period, appellant, who had apparently been on parole at the time of the murder, had his parole revoked and was returned to the penitentiary. Thus, we are not able to ascertain whether any delay was caused by other pending charges and a trial on another offense, or by parole revocation proceedings or for some other reason.

Appellant also contends that he was prejudiced by the delay in bringing him to trial, in that the prosecution was able to gather additional incriminating evidence against him. As stated previously, appellant was being held in Harris County on charges which arose in 1972. We do not find that appellant had any right to be tried in Fort Bend County on a charge which arose in 1974, prior to being tried in another county on a charge which arose in 1972. Finally, appellant's motion for a speedy trial, overruled on October 21, 1977, does not show when, if ever, it was filed prior to this date. Taking into consideration both the failure of the record to support appellant's claims, and the few facts which the record does reflect, we conclude that appellant has failed to show that he was denied his right to a speedy trial. This ground of error is overruled.

In his fourth ground of error, appellant contends that he was "denied his right to challenge the Grand Jury Array." The record reflects that the trial court denied appellant's challenge to the grand jury array, which he contended was unconstitutionally impaneled. See Articles 19.27, 19.28, 19.30, 19.32, Vernon's Ann.C.C.P. The docket

sheet reflects that this challenge was filed on July 8, 1977, subsequent to appellant's indictment.[2]

We need not decide whether appellant filed his challenge to the array at the first opportunity as required. See *Muniz v. State*, 573 S.W.2d 792 (Tex.Cr.App.1978). We hold that the trial court did not err in overruling this motion, because appellant failed to offer or present any proof thereon. The record reflects that at a pre-trial hearing on October 21, 1977, appellant was given an opportunity to present evidence in support of his motion, and declined to do so. Thus, he failed to make any showing that the grand jury which indicted him was unconstitutionally composed. See *Burks v. State*, 583 S.W.2d 389 (Tex.Cr.App.1978); see also, *Hilliard v. State*, 513 S.W.2d 28 (Tex.Cr.App.1974); *King v. State*, 511 S.W.2d 32 (Tex.Cr.App.1974). This ground of error is overruled.

In his fifth ground of error, appellant contends that the trial court erred in denying his pro se motion to quash the indictment. In this motion to dismiss the indictment, he contends again that the grand jury which indicted him was unconstitutionally composed and impaneled. As we have stated above, appellant, when given the opportunity to present proof of his allegations, failed to do so. As such, the trial court did not err in overruling this motion. See *Burks v. State*, supra. This ground of error is overruled.

Appellant next contends that the trial court erred in overruling his motion to quash the indictment, as it contained three offenses charged in one count. The record reflects that the indictment alleged that appellant committed murder while "in the course of committing and attempting to commit the offense of kidnapping" of the deceased, and that he committed murder while "in the course of committing and attempting to commit the offense of robbery "of the deceased."[3] These are two theories of the offense of capital murder under V.T.C.A., Penal Code, Sec. 19.03(a)(2) (formerly Article 1257, Vernon's Ann.P.C.). Appellant's contention that this is in violation of Article 21.24, Vernon's Ann.C.C.P.[4] was answered adversely to him in *Jurek v. State*, supra. See also, *Ex Parte Easley*, 490 S.W.2d 570 (Tex.Cr.App.1972); *Vannerson v. State*, 408 S.W.2d 228 (Tex.Cr.App. 1966). This ground of error is overruled.

In his seventh ground of error, appellant contends that the trial court erred in refusing to instruct the jury that Delores Ann Smallwood was an accomplice witness. We do not agree.

An accomplice witness is someone who has participated with another before, during, or after the commission of a crime. *Villarreal v. State*, 576 S.W.2d 51 (Tex.Cr.App.1979); *Ferguson v. State*, 573 S.W.2d 516 (Tex.Cr.App.1978); *Jackson v. State*, 552 S.W.2d 798 (Tex.Cr.App.1977). One is not an accomplice witness who cannot be prosecuted for the offense with which the accused is charged.[5] *Villarreal v. State*, supra; *Ferguson v. State*, supra; *Easter v. State*, 536 S.W.2d 223 (Tex.Cr. App.1976). A witness is not deemed an accomplice witness because he knew of the crime but failed to disclose it or even concealed it. *Villarreal v. State*, supra; *Ferguson v. State*, supra; *Easter v. State*, supra. Further, it is well settled that mere presence at the scene of the offense does not compel the conclusion that the witness is an accomplice witness. *Arney v. State*, 580

---

2. Appellant's assertion that this motion was filed in 1974 is not supported by the record.

3. The record reflects that prior to trial, the State abandoned the count dealing with robbery, and proceeded on the murder-kidnapping charge.

4. Article 21.24, supra, provides in part:
 "(b) A count may contain as many separate paragraphs charging the same offense as necessary, but no paragraph may charge more than one offense.
 (c) A count is sufficient if any one of its paragraphs is sufficient. An indictment, information or complaint is sufficient if any one of its counts is sufficient."

5. We note that the jury was charged that Lloyd Harris was an accomplice as a matter of law.

S.W.2d 836 (Tex.Cr.App.1979); *Easter v. State*, supra.

Smallwood, approximately seventeen years old at the time of the offense, testified that she was present during the abduction and shooting of the deceased. She had spent the previous night with appellant and Harris. She testified that she had no idea what was going on when the three picked the deceased up at his apartment complex. She stated that she stayed in the car when appellant took the deceased out into the woods, and that she was very scared. She stated that at that time, she did not know what was happening but that she knew it was something bad after she heard the shots. After the shooting, appellant and Harris took her home.

█ The sum of the evidence adduced concerning Smallwood's participation in the killing shows only that she was present at the scene of the offense. The record in the instant case does not reflect any affirmative act on Smallwood's part to assist in or encourage the murder. See *Caraway v. State*, 550 S.W.2d 699 (Tex.Cr.App.1977); *Chappell v. State*, 519 S.W.2d 453 (Tex.Cr. App.1975). Appellant made no showing that Smallwood participated in planning or promoting the offense, or that Smallwood had any knowledge of what was about to transpire. Compare *Cross v. State*, 550 S.W.2d 61 (Tex.Cr.App.1977). As we have previously stated, Smallwood's mere presence at the scene of the offense does not compel the conclusion that she was an accomplice. *Villarreal v. State*, supra; *Arney v. State*, supra. Since there was no evidence adduced at trial to show other than Smallwood's mere presence at the scene of the offense, we hold that the trial court did not err in refusing to instruct the jury that she was an accomplice witness.

In view of our disposition of this ground of error, we need not address appellant's additional contention that Smallwood's testimony, which appellant contends was that of an accomplice witness, was insufficient to corroborate the accomplice witness' testimony of Harris. See Article 38.14, Vernon's Ann.C.C.P. Appellant's seventh ground of error is overruled.

In four grounds of error, appellant complains of the admission into evidence of an extraneous offense, i. e., the 1972 robbery of Thomas Stearns, the deceased, and of appellant's subsequent prosecution for that offense. We conclude that this evidence, which included evidence of an extraneous offense, was admissible in the instant case.

█ In *Hines v. State*, 571 S.W.2d 322 (Tex.Cr.App.1978), we reiterated that it is well established that an accused may not be tried for some collateral crime or for being a criminal generally. Accord, *Holley v. State*, 582 S.W.2d 115 (Tex.Cr.App.1979); *Etchieson v. State*, 574 S.W.2d 753 (Tex.Cr. App.1978); *Cameron v. State*, 530 S.W.2d 841 (Tex.Cr.App.1975); *Halliburton v. State*, 528 S.W.2d 216 (Tex.Cr.App.1975). However, there are situations in which extraneous criminal offenses committed by the accused are admissible. In *Brooks v. State*, 580 S.W.2d 825 (Tex.Cr.App.1979), we stated that:

"[t]he general rule against admitting evidence of other crimes by the accused is inapplicable if such evidence logically tends to show his guilt of the offense charged. In other words, relevant evidence that tends to prove that the accused committed the crime charged is not inadmissible simply because it may also reveal that he has committed other crimes."

See also, *Albrecht v. State*, 486 S.W.2d 97 (Tex.Cr.App.1972); *Johnston v. State*, 418 S.W.2d 522 (Tex.Cr.App.1967).

█ One of the exceptions to the general rule that an accused is entitled to be tried on the accusation made in the State's pleading and not for some collateral crime, is that evidence which would show a *motive* is admissible even though it would also show the commission of a collateral or extraneous offense. *Rodriguez v. State*, 486 S.W.2d 355 (Tex.Cr.App.1972). *Summers v. State*, 464 S.W.2d 126 (Tex.Cr.App.1971); *Stephens v. State*, 147 Tex.Cr.R. 510, 182 S.W.2d 707 (1944); *Stalcup v. State*, 130 Tex.Cr.R. 119, 92 S.W.2d 443 (1936); *Miller*

*v. State*, 129 Tex.Cr.R. 166, 84 S.W.2d 459 (1935).

In *Rodriguez v. State*, supra, we stated that evidence to show motive is merely one kind of evidence aiding in establishing proof of an alleged offense:

"The prosecution may always offer evidence, if it is known to exist, to show motive for the commission of an offense because it is relevant as a circumstance tending to prove the commission of an offense."

See *Rodriguez v. State*, supra, and cases cited therein.

In *Hughes v. State*, 563 S.W.2d 581 (Tex. Cr.App.1978), the defendant was tried for the capital murder of a police officer who had attempted to approach him. Therein, we held that evidence that appellant had been previously convicted of extortion and had received a probated sentence, was admissible at his murder trial, as bearing on the defendant's motive to avoid being apprehended by the officer. In *Chappell v. State*, 519 S.W.2d 453 (Tex.Cr.App.1975), we held that evidence concerning two robbery indictments pending against the defendant and an arrest warrant were admissible in his trial for murder and attempted escape from custody. We stated that these extraneous matters were admissible to show the motive which prompted the commission of the attempted escape, and that future prosecutions which the defendant would face were directly related to this motive. In *Cherry v. State*, 488 S.W.2d 744 (Tex.Cr.App.1972), we held admissible proof that the defendant, who had killed a police officer, had recently escaped from a Georgia prison where he had been serving a life sentence. This evidence was held to be admissible to show the defendant's motive for killing the officer who had attempted to apprehend him. In *Washburn v. State*, 167 Tex.Cr.R. 125, 318 S.W.2d 627 (1958), the defendant's trial for murder, evidence was admitted that four years prior to the murder, the defendant had attempted to extort money from this same person whom he had later killed. This evidence, together with other facts, was held to show his motive for the killing. See also V.T.C.A. Penal Code, Sec. 19.06, which provides for the admission of "all relevant facts and circumstances" surrounding a murder offense, including "the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense." See *Shaw v. State*, 530 S.W.2d 838 (Tex.Cr.App. 1976); *Ruiz v. State*, 523 S.W.2d 691 (Tex. Cr.App.1975); *Alford v. State*, 505 S.W.2d 813 (Tex.Cr.App.1974).

In the instant case, we hold that the evidence relating to appellant's being charged with the 1972 robbery of the deceased, his offer to plead guilty to that offense, and his subsequent withdrawal of that plea the day after he murdered the deceased, was relevant to show his motive for the commission of the capital offense. Thus, the evidence was admissible even though it showed the commission of an extraneous offense. See *Brooks v. State*, supra; *Hughes v. State*, supra; *Chappell v. State*, supra; *Cherry v. State*, supra; *Rodriguez v. State*, supra; *Washburn v. State*, supra. Grounds of error eight, ten, sixteen and eighteen are overruled.

In his ninth ground of error, appellant contends that "Dr. Joseph Alexander Jachimczyk, an M.D. and Pathologist, was not qualified as a witness." Dr. Jachimczyk testified as to the cause of death of the deceased. The basis of appellant's objection to Dr. Jachimczyk's testimony at trial was that "the mere belonging to a field or profession does not make one an expert." On appeal, appellant contends that since the doctor's license to practice medicine was not on file in the county in which he testified, he was disqualified from testifying under Tex.Rev.Civ.Stat.Ann., arts. 4498–4498.1. Since appellant's ground of error on appeal differs from his objection at trial, nothing is presented for review. *Williams v. State*, 531 S.W.2d 606 (Tex.Cr. App.1975). However, even if appellant had preserved error, this contention is without merit. Dr. Jachimczyk testified that his medical license was on file in Harris and

252

Galveston Counties. Articles 4498–4498.1, supra, only require that a physician's license be on file in those counties in which he resides and practices medicine; there is no requirement that his license be filed in each county in which he may be called as a witness to testify. This ground of error is overruled.

■ In his eleventh ground of error, appellant complains of the admission into evidence of State's Exhibit # 10, a signed agreement to plead guilty to the robbery of the deceased, which bore appellant's signature. He contends in this ground of error and in his nineteenth ground of error that the court erred in admitting this document without charging the jury on the law of evidence of handwriting. See Articles 38.-26, 38.27, Vernon's Ann.C.C.P. No error is shown.

The record reflects that appellant did not request a charge to the jury on handwriting until after the court's charge was read to the jury and arguments of counsel were heard and the jury retired to deliberate. As such, the requested charge came much too late, and the trial court did not err in refusing it. See Article 36.15, Vernon's Ann.C.C.P.; *Simmons v. State*, 493 S.W.2d 937 (Tex.Cr.App.1973); *Fair v. State*, 465 S.W.2d 753 (Tex.Cr.App.1971). Grounds of error eleven and nineteen are overruled.

Additionally, appellant contends in places scattered throughout his brief, that the trial court erred in admitting this exhibit, as appellant had denied that the signature thereon was his. The record reflects that Ken Sparks testified that appellant and his attorney Gerald Goynes appeared in court in February of 1974, and entered into plea negotiations concerning the robbery charge against appellant. Sparks testified that an agreement was reached between the parties, and that papers were executed. Sparks stated that Goynes signed State's Exhibit # 10, the stipulation of evidence and waiver of jury trial, and that he observed appellant before the clerk's desk, with a pen, moving his hand in a "signature motion" on the paper.

■ Another document, State's Exhibit # 11, which bore a signature which appellant admitted was his, was introduced into evidence for comparison of the signatures. Appellant testified at this time and strenuously denied that it was his signature contained on Exhibit # 10. He vigorously maintained that his attorney, Goynes, forged his name to the document. He now contends that since he denied that Exhibit # 10 contained his signature, it should not have been admitted into evidence. We find no merit in this contention.

Exhibit # 10 bore a signature purporting to be that of appellant. Sparks testified that he observed appellant making motions as if he were signing the document. Another document, which contained a signature which appellant admitted was his, was introduced into evidence for comparison. Further, Goynes testified and stated that he had not forged appellant's name to the document. When appellant denied that he ever signed the document, this created a question of fact for the jury as the finders of facts. We hold that the trial court did not err in admitting the evidence to be considered by the trier of facts. *Salinas v. State*, 479 S.W.2d 913 (Tex.Cr.App.1972); see also, *Herndon v. State*, 543 S.W.2d 109 (Tex.Cr.App.1976). This contention is overruled.

■ In his twelfth ground of error, appellant contends that the trial court erred in admitting the testimony of Gerald Goynes, appellant's former attorney. Goynes testified that he had represented appellant in early 1974 on the robbery charge. Goynes stated that he had appeared in court with appellant and that he (Goynes) had signed State's Exhibit # 10, the stipulation of evidence and waiver of jury trial, as appellant's attorney. Goynes further denied that he signed or forged appellant's name to the document. Appellant contends that this testimony was a violation of the confidentiality of the attorney-client relationship under Article 38.10, Vernon's Ann.C.C.P. This statute provides, in part, that:

"an attorney at law shall not disclose a communication made to him by his client during the existence of that relationship, nor disclose any other fact which came to the knowledge of such attorney by reason of such relationship."

In the instant case, we find that Goynes' testimony that he had not signed appellant's name to the document did not disclose any communication between counsel and appellant, nor was this fact one which came to Goynes' knowledge by reason of the confidential attorney-client relationship. See *Church v. State*, 552 S.W.2d 138 (Tex.Cr. App.1977); *Cathey v. State*, 467 S.W.2d 472 (Tex.Cr.App.1971); see also, *Ballard v. Ballard*, 296 S.W.2d 811 (Tex.Civ.App.1956). Since there was no violation of Article 38.-10, supra, nor was the attorney-client privilege invaded, this ground of error is overruled.

In his thirteenth ground of error, appellant complains of the admission into evidence of photographs of the body of the deceased at the scene where it was discovered.[6] In *Burks v. State*, 583 S.W.2d 389 (Tex.Cr.App.1979), we reiterated that if a verbal description of the body and scene of the crime would be admissible, then a photograph depicting the same is admissible. *Burks v. State*, supra; *Welch v. State*, 576 S.W.2d 638 (Tex.Cr.App.1979); *Shannon v. State*, 567 S.W.2d 510 (Tex.Cr.App.1978); *Denney v. State*, 558 S.W.2d 467 (Tex.Cr. App.1977); *Cerda v. State*, 557 S.W.2d 954 (Tex.Cr.App.1977); *Martin v. State*, 475 S.W.2d 265 (Tex.Cr.App.1972).

■ In the instant case, verbal descriptions of the body of the deceased and of the scene of the murder were admissible. Therefore, the trial court did not err in admitting them. This ground of error is overruled.

In his next ground of error, appellant complains of the testimony of Officer Ernest Taylor and of photographs of an automobile admitted into evidence. The record reflects that it was undisputed that at around the time of the offense, appellant was driving his brother's 1972 beige and brown Monte Carlo. Testimony of Harris and Smallwood showed that this was the car which appellant was driving when he abducted the deceased and in which trunk he locked the deceased prior to the murder. Officer Taylor testified that in January of 1977, some two years and ten months after the commission of the offense, he located this automobile in San Antonio. It had been sold twice since appellant's brother owned it. Officer Taylor examined the car, and inside the lid of the trunk, next to the locking mechanism, he found a black smudge which appeared to have been put there from the inside of the trunk. The smudge was tested and was found to be soot or smut. Taylor also testified that he duplicated the mark by striking a match and holding it against the lid of the trunk. Appellant objected to this testimony and to photographs of the automobile trunk which were introduced because of the period of time which had elapsed between the offense and the discovery of the automobile. The trial court ruled that appellant's objection went to the weight of the evidence rather than its admissibility.

■ The evidence in the instant case clearly connected this automobile to appellant and to the offense for which he was on trial. Evidence also showed that the deceased had been locked in the automobile trunk prior to his murder. There was some evidence adduced which indicated that the deceased had smoked cigarettes or burned something while locked in the trunk. Officer Taylor testified that the smudge mark was in such a location that it would not have been touched or removed in the normal use or cleaning of the trunk or car. Thus, we conclude that the trial court was correct in ruling that any objection based on the lapse of time between the offense and the date which the car was discovered, went to the weight of the evidence rather than its admissibility. See *Pringle v. State*, 511 S.W.2d 35 (Tex.Cr.App.1974); *Hicks v.*

---

**6.** Appellant also complains of the admission into evidence of photographs of an automobile; this will be discussed with a subsequent ground of error.

*State*, 508 S.W.2d 400 (Tex.Cr.App.1974); *Alejandro v. State*, 394 S.W.2d 523 (Tex.Cr. App.1965). This ground of error is overruled.

In his seventeenth ground of error, appellant contends that the trial court erred in admitting the testimony of Fred Hewitt concerning appellant's incriminating statements made to that witness. He contends that these statements were admissible "only if [appellant] was aware of incriminating himself by the declaration at the time he made it." Appellant cites no authority in support of this contention, and we find none in state law. This contention is without merit. We further note that an admission by an accused to a third party is not hearsay and is clearly admissible. *Hasley v. State*, 442 S.W.2d 739 (Tex.Cr.App.1969); *Gibson v. State*, 430 S.W.2d 507 (Tex.Cr. App.1968). This ground of error is overruled.

In his final ground of error, appellant contends that the evidence is insufficient to support the jury's finding that there is a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society. Article 37.071(b)(2), Vernon's Ann.C.C.P. We cannot agree.

It is well settled that in assessing punishment, the jury may consider all of the evidence adduced at trial on guilt or innocence. *Demouchette v. State*, 591 S.W.2d 488 (Tex.Cr.App.1979); *O'Bryan v. State*, 591 S.W.2d 464 (Tex.Cr.App.1979); *Duffy v. State*, 567 S.W.2d 197 (Tex.Cr.App. 1978); *Felder v. State*, 564 S.W.2d 776 (Tex. Cr.App.1978); *Brock v. State*, 556 S.W.2d 309 (Tex.Cr.App.1977). The calculated nature of a defendant's acts and the forethought with which he executed his crime is certainly probative evidence of his propensity to commit future acts of violence. See *O'Bryan v. State*, supra; *Brooks v. State* (No. 60,521, Tex.Cr.App., delivered March 21, 1979); *Earvin v. State*, 582 S.W. 2d 794 (Tex.Cr.App.1979); *Felder v. State*, supra. *Duffy v. State*, supra. Indeed, the circumstances of the offense may furnish extremely probative evidence of the probability of future acts of violence. See *O'Bryan v. State*, supra; *Duffy v. State*, supra; *Brock v. State*, supra; *Burns v. State*, 556 S.W.2d 270 (Tex.Cr.App.1977).

In the instant case, appellant kidnapped at gunpoint, sexually abused and shot through each side of the head, a person who was to testify against him in a pending robbery case. The victim had been unknown to appellant, who murdered him because his testimony could have resulted in a conviction against appellant. After appellant murdered the deceased, he laughed and bragged about it to his companions; the record reflects that several weeks later he was still bragging about it. The cold and calculated manner in which appellant lay in wait for his victim, drove him to a rural area and executed him for the reason which he did is certainly probative evidence of appellant's propensity to commit future acts of violence. See *O'Bryan v. State*, supra; *Brooks v. State*, supra; *Earvin v. State*, supra; *Felder v. State*, supra; *Duffy v. State*, supra; *Burns v. State*, supra.

In addition, there was no evidence that appellant was under the influence or domination of anyone else; we have previously stated that this is probative evidence on special issue number two. *Demouchette v. State*, supra; *Earvin v. State*, supra; *Duffy v. State*, supra; *Hovila v. State*, 562 S.W.2d 243 (Tex.Cr.App.1978). There is no evidence that appellant was under mental or emotional pressure which might mitigate his actions; the presence or absence of such pressure is also probative evidence. *Demouchette v. State*, supra; *O'Bryan v. State*, supra; *Duffy v. State*, supra; *Jurek v. State*, 522 S.W.2d 934 (Tex. Cr.App.1975).

The evidence also reflects that appellant had a criminal record, which included prior assaultive offenses. Testimony showed that in 1967 appellant was convicted and sent to prison for the offenses of burglary, robbery and assault with intent to murder. He was paroled in December of 1971. Some three months after he was released, the alleged robbery occurred in

April of 1972. He was arrested for the robbery in August of 1972, and stayed in jail until January of 1974. Within three months of his release on bond from jail, he committed the capital offense. The record further reflects that appellant was on parole at the time of the capital offense. According to appellant's own testimony, during the ten years prior to his capital murder trial, he had only been out of penal institutions for a total of one year. Thus, the jury heard evidence that appellant was convicted of three felony offenses, was sentenced to prison, was released on parole, was charged with the commission of a robbery, was returned to jail, was released on bond and then committed the capital offense, hoping to escape the robbery charge. We find that this evidence is extremely probative of appellant's propensity to commit future acts of violence.

Not only was the jury confronted with evidence of appellant's calculated, deliberate and brutal murder of the deceased, but they were confronted with appellant's disregard of and assault on the entire foundations of the criminal justice system. We conclude that the evidence is sufficient for the jury to have found that there is a probability that appellant would commit future criminal acts of violence that would constitute a continuing threat to society. See and compare *Demouchette v. State*, supra; *O'Bryan v. State*, supra; *McMahon v. State*, 582 S.W.2d 786 (Tex.Cr.App.1979); *Brooks v. State*, supra; *Earvin v. State*, supra; *Starvaggi v. State*, 593 S.W.2d 323

(1979); *Villarreal v. State*, 576 S.W.2d 51 (Tex.Cr.App.1979); *Muniz v. State*, 573 S.W.2d 792 (Tex.Cr.App.1978); *Adams v. State*, 577 S.W.2d 717 (Tex.Cr.App.1979); *Bodde v. State*, 568 S.W.2d 344 (Tex.Cr.App.1978); *Von Byrd v. State*, 569 S.W.2d 883 (Tex.Cr.App.1978); *Duffy v. State*, supra; *Felder v. State*, supra; *Brock v. State*, 556 S.W.2d 309 (Tex.Cr.App.1977); *Shippy v. State*, supra; *Granviel v. State*, 552 S.W.2d 107 (Tex.Cr.App.1976); *Moore v. State*, 542 S.W.2d 664 (Tex.Cr.App.1976). This ground of error is overruled.

The judgment is affirmed.

ROBERTS, J., concurs in the results.

CLINTON, Judge, dissenting.

*Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) is founded on the guarantee of an impartial jury prescribed by the Sixth Amendment as applied to the states by the Fourteenth Amendment.[1] By its very terms the rule enunciated in *Witherspoon* applies to what in the federal system of criminal justice is called sentencing.[2] If confirmation of this verity is needed, *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) provides it.[3] That which is called sentencing by the Supreme Court we know as assessment of punishment. Since in a capital murder case the jury no longer assesses punishment, the *Witherspoon* holding does not now come into play. *Hovila v. State*, 532 S.W.2d 293,

1. Article I, § 10, of the Bill of Rights in the Constitution of Texas is an independent source of the same right. Indeed, refusal of the Mexican Government to secure, on a firm basis, the right of trial by jury was one of the primal grievances expressed in our Declaration of Independence, 3 Vernon's Texas Constitution 520.

2. ". . . Specifically, *we hold* that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected," *Witherspoon*,

supra, 391 U.S. at 522, 88 S.Ct. at 1776–1777. (All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.)

3. "In *Witherspoon*, persons generally opposed to capital punishment had been excluded for cause from the jury that convicted and sentenced the petitioner to death. We did not disturb the conviction but we held that 'a sentence of death cannot be carried out . . .'," *Lockett*, supra, 438 U.S. at 596, 98 S.Ct. at 2960; the Supreme Court held that four jurors were properly excluded "assuming *arguendo* that *Witherspoon* provides a basis for attacking the conviction as well as the sentence in a capital case," *id.* (italics in original).

296[4] (Tex.Cr.App.1976) (Odom, J., dissenting). In short, whether a venireperson is scrupled against imposition of the death penalty is not germane to service as a juror in the sense of being disqualified for cause.[5]

I have come to that conclusion well aware that this Court has diagnosed *Witherspoon* "alive and well" in, e. g., *Brock v. State*, 556 S.W.2d 309, 312 (Tex.Cr.App.1977) and, indeed, permits disqualification of a prospective juror "under either said § 12.31(b) or *Witherspoon* or both," *id.* at 313, *Bodde v. State*, 568 S.W.2d 344, 348 (Tex.Cr.App. 1978), *Moore v. State*, 542 S.W.2d 664, 672 (Tex.Cr.App.1976). The examination that bases the diagnosis is always said to have been made in *Hovila v. State*, 532 S.W.2d 293 (Tex.Cr.App.1976); see *Brock* and *Moore*, supra.

The whole of that examination is revealed by *Hovila*, supra at 294, to have been as follows:

> "While the new statutes provide that the jury shall take an oath that they will not let the penalty involved affect their deliberations and requires them only to answer questions while the judge actually assesses the punishment based on such answers, the fact remains that the jury will know that their answers will determine whether the defendant is to be punished by death or by life imprisonment. To say that the jury's answers would not be affected by their attitude toward the death penalty as a punishment for crime simply because they will not bring forth the ultimate verdict would be to disregard the obvious. We will not engage in such tenuous reasoning.
>
> We hold, therefore, that the *Witherspoon* test remains the same."

The stated rationale of *Hovila* is less than satisfactory for me. Its core premise is that, knowing that punishment is either death or confinement for life, jurors *obviously* will allow their attitude about capital punishment to color their fact finding. The conclusion drawn from that premise is venirepersons must be measured by the *Witherspoon* standard. I must say, first off, that perceiving every prospective juror as some sort of rogue is not all that obvious to me.[6] But, be that as it may, the truly operative notion is that a juror, individually or collectively with others, is so likely to corrupt his duty through personal bias that close examination of deeply held scruples is necessarily appropriate to expose the prospective fraud. Even if experience has produced an occasional juror so eager to serve as to resort to misrepresentation, it occurs to me that all conceivable questioning will not discover the ploy. In any event, certainty that jurors' answers to issues will be affected by their attitude toward the death penalty is an essential element of the *Hovila* formulation in order to equate the special issue juror with the death verdict juror. Therein is the fallacy of *Hovila*, in my judgment.

The mental exercises of jurors who must give factual answers to penetrating questions are significantly different from the thoughts of jurors who are called on to write a verdict of death or life imprisonment. The former work with fellow jurors under constraints of a process of reasoning and deduction from evidence, whereas the death or life verdict is much more a matter of unfettered discretion. Indeed, it was the latter characteristic which was recognized and identified as the fatal flaw that rendered the former capital punishment stat-

---

4. "The procedure set out in Article 37.071, supra, is mechanical, and provides for a mandatory death penalty upon an affirmative answer to each of the special fact issues submitted under Section (b). The jury neither imposes nor recommends imposition of the death penalty under this statute."

5. Of course, the matter of scruples concerning capital punishment is still a pertinent inquiry for purposes of exercising preemptory challenges.

6. As Mr. Justice White so accurately remarked about our revised sentencing procedure in *Jurek v. Texas*, 428 U.S. 262 at 279, 96 S.Ct. 2950 at 2959, 49 L.Ed.2d 929 (1976) (Opinion concurring in the judgment): "The statute does not extend to juries discretionary power to dispense mercy, and it should not be assumed that juries will disobey or nullify their instructions."

utes unconstitutional in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); as the Supreme Court later described it in *Gregg v. Georgia*, 428 U.S. 153, 188, 189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976), "*Furman* held that (the death penalty) could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner," and "mandates that where discretion is afforded a sentencing body on a matter so grave . . ., that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." On the other hand, a post *Furman* capital punishment statute meets its concerns when a system is created that "provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information," *Gregg*, supra, at 195, 96 S.Ct. at 2935.[7] Thus, *Hovila* errs in finding alike that which is designedly distinct—its major premise falls.

However, *Hovila* did correctly relate the problem to § 12.31(b). The error was solving it with *Witherspoon*.[8] The objective of *Witherspoon* is to provide to the accused a larger pool of prospective jurors that is more representative of the community attitude toward infliction of the death penalty—using the converse of its own phrases, to unstack the deck against him and to preempt the hanging jury. Conceding that the results reached in *Hovila* are consistent with that objective, still it seems to me that the *Witherspoon* ritual is not suitable to evoke from a venireman a meaningful admission that he will likely shirk or corrupt the duty as a juror that his oath and the

law require.[9] For, as the Supreme Court observed in *Boulden v. Holman*, 394 U.S. 478, 483-484, 89 S.Ct. 1138, 1141-1142, 22 L.Ed.2d 433 (1969):

> "[I]t is entirely possible that a person who has 'a fixed opinion against' or who does not 'believe in' capital punishment might nevertheless be perfectly able as a juror to abide by existing law—to follow conscientiously the instructions of the trial judge and to consider fairly the imposition of the death sentence in a particular case."

The same principle is, I believe, applicable to a Texas juror who is called on to answer from the evidence the two or three special issues submitted under Article 37.071, V.A. C.C.P.

Where the jury is not the assessor of punishment in a capital case but is charged with finding facts upon which that assessment is made, the *Witherspoon* holding gives way to another doctrine for testing the qualification of veniremen that *Witherspoon*, supra, at 523, n. 21, 88 S.Ct. at 1777, took express pains not to preclude. That is, as subsequently developed in *Lockett v. Ohio*, 438 U.S. 586, 596, 98 S.Ct. 2954, 2960 (1978):

> "Each of the excluded veniremen in this case made it 'unmistakenly clear' that they could not be trusted to 'abide by existing law' and 'to follow conscientiously the instructions' of the trial judge. *Boulden v. Holman*, 394 U.S. 478, 484, 89 S.Ct. 1138, 1142, 22 L.Ed.2d 433 (1969)."

That this doctrine arose from a context of guilt-innocence does not render an adaption of it inappropriate at the punishment stage, for in both the jury is serving as a factfinder rather than exercising discretion in as-

---

7. Moreover, "[w]here the sentencing authority is required to specify the factors it relied upon in reaching its decision, the further safeguard of meaningful appellate review is available to ensure that death sentences are not imposed capriciously or in a freakish manner," *Gregg*, supra, at 195, 96 S.Ct. at 2935.

8. In *Livingston v. State*, 542 S.W.2d 655, 658 (Tex.Cr.App.1976), and in *Moore v. State*, 542 S.W.2d 644, 671 (Tex.Cr.App.1976), the first and second cases to cite *Hovila*, the Court stated that *Witherspoon* remained viable "in light

of the new statutory scheme providing for the imposition of the death penalty;" and in *Boulware v. State*, 542 S.W.2d 677, 682 (Tex.Cr. App.1976), the third citing of *Hovila*, the Court put it more directly, saying that *Witherspoon* "is equally applicable under the procedure set forth in Article 37.071, V.A.C.C.P."

9. Essentially, that lesson was learned in *Moore*, supra at 672: veniremen arguably qualified under *Witherspoon* may, nevertheless, disqualify under Section 12.31(b).

sessing punishment. Indeed, the oath prescribed by § 12.31(b) is in constitutional trouble precisely because the Court has not insisted that "at the least . . . the effect be a profound, perhaps an insurmountable, one before the venireman can be disqualified," *Burns v. Estelle*, 592 F.2d 1297, 1301 (5 Cir. 1979), overturning *Burns v. State*, 556 S.W.2d 270, 276[10] (Tex.Cr.App. 1977), rehearing en banc heard January 8, 1980; *Adams v. Texas*, cert. granted, 444 U.S. 990, 100 S.Ct. 519, 62 L.Ed.2d 419, December 10, 1979,[11] to review *Adams v. State*, 577 S.W.2d 717, 728 (Tex.Cr.App. 1979), rather than merely affirm that his deliberations on the punishment would be affected by the mandatory penalty of death or life imprisonment,[12] as in, e. g., *Whitmore v. State*, 570 S.W.2d 889, 893 (Tex.Cr. App.1976–1978), *Freeman v. State*, 556 S.W.2d 287, 297–298 (Tex.Cr.App.1977), *Shippy v. State*, 556 S.W.2d 246, 251 (Tex. Cr.App.1977).

Accordingly, because I am persuaded that the *Witherspoon* holding, per se, is no longer a viable measure of qualifying jurors in the bifurcated proceedings in a capital case, in that they do not directly assess punishment, and that a good deal more manifestation than merely acknowledging "the magic phrase" of § 12.31(b) should be required for disqualification, I respectfully dissent.

---

10. With respect to the venireperson Doss, after she acknowledged simply that the mandatory penalties would "affect" her deliberations on the issues, the State challenged for cause; the lawyer for accused stated to the trial court, "I think we should ask some further questions about this matter;" the trial court opined, "I don't know what you could ask;" and prosecutor remarked, "That's the magic term phrase and she answered it the way you are supposed to." Her disqualification was approved, *Burns, supra*, at 278.

11. The two questions framed by the Supreme Court itself in granting certiorari are:
 1. Is the doctrine of *Witherspoon* applicable to the bifurcated procedure employed in Texas in capital cases?

2. If so, did exclusion from jury service in present case of prospective jurors pursuant to § 12.31(b) violate the doctrine of *Witherspoon*?

12. From the records being reviewed by this Court it also appears that scant attention is being given by the bench and the bar to the disjunctive feature of § 12.31(b)—"mandatory penalty of death *or* imprisonment for life." The Supreme Court has recognized, but explicitly not passed on, "the 'penitentiary' analogue to death-qualification of jurors," *Boulden v. Holman, supra*, 394 U.S. at 484, n. 7, 89 S.Ct. at 1141.