Sherry WOLF, Appellant,

v.

STATE of Texas, Appellee.

No. 13–83–429–CR.

Court of Appeals of Texas, Corpus Christi.

June 14, 1984.

832

Randy Schaffer, Houston, for appellant.

Reynaldo Cantu, Jr., Dist. Atty., Brownsville, for appellee.

Before NYE, C.J., and UTTER and YOUNG, JJ.

## OPINION

UTTER, Justice.

A jury found appellant Sherry Wolf guilty of murdering George William (Billy) Staton, Jr. The jury was then waived, and the trial court assessed punishment at life in the Texas Department of Corrections.

The grounds of error concerning the sufficiency of the evidence raised by appellant require a detailed recitation of the evidence. The evidence was required to show that appellant and her husband, Paul Wolf (Wolf), and Glenn Henderson (Henderson), caused the death of Billy Staton (Staton), her former husband.

The State's key witness, Henderson, was one of the participants in the crime who, by his own admissions, beat and shot and killed Letticia Castro (Staton's girlfriend) and helped kill Staton. Much of Henderson's testimony was devoted to explaining how he became involved in the conspiracy to kill Staton: According to Henderson, he, Wolf and appellant were together on one occasion when Wolf told him that they wanted to kill Staton because he was causing trouble at the house and that they did not want him around anymore. On a second occasion, about two weeks later, Paul Wolf suggested to Henderson the possibility of Henderson's assistance in killing both

Staton and Castro. Appellant was present when this suggestion was made; although Wolf was the person who requested Henderson's aid, appellant did nothing to dissuade Wolf from talking about the possibility of killing Staton. Henderson said nothing in response to the request because he thought "they were kidding."

On a third occasion about a week before the murders, Henderson was at the Wolfs' house when Wolf again requested his help in killing both Staton and Castro. Wolf explained that he and appellant had already developed most of the details of a plan but that Henderson was needed because "I'd been in the fire department, I've been around people that's already been dead." Appellant was again present during this discussion. On a fourth occasion on the Sunday before the murders, Wolf explained to Henderson that he and appellant had been out looking for a place to hide the bodies. This conversation occurred while appellant and Wolf sat together in a love seat in the Wolfs' living room. It appears from the record that Wolf did most, if not all, of the talking at this meeting but that appellant was present and made no effort to object or deny her involvement.

On the next Tuesday, Wolf, by himself, went to Henderson's house and asked whether Henderson would help. Henderson agreed "to be a friend." On Thursday, the day before the murders, Wolf, again alone, met with Henderson. Wolf said that he and appellant had devised a plan to kill Staton, and he explained to Henderson how he (Wolf) was going to use a bar to hit Staton in the head. Wolf also told Henderson where a hammer would be hidden and "what we going to use the hammer for." Other details of the plan were not told to Henderson at that time. On Friday, July 16, 1982, the day of the murders, around 6:00 p.m., Henderson was picked up by Wolf and was driven to the Wolfs' house

where appellant and her small child, Melanie, were awaiting.[1]

Henderson then told the jury about the Wolfs' house. Diagrams and other visual aids were displayed to the jury for their understanding of the layout of the Wolfs' house and the location of various furniture.

Henderson further testified regarding the conspiracy as follows: According to Henderson, he sat in "the little seat" and Wolf and appellant sat in the love seat in the living room of the Wolfs' house, while Wolf went over the plan. A bar that Henderson had never seen before was leaning up against a wall, and a hammer had been hidden under some bushes outside the house. Appellant told Wolf that she was going to put clothing on the living room couch, so that, when Staton next visited the house to pick up Melanie, he would be forced to sit in a particular living room chair from where he would be unable to see his attackers, Wolf and Henderson.[2] The plan called for Henderson and Wolf to dispose of the bodies and for appellant to stay at the house and clean up the blood after the murder. Appellant reaffirmed that her role was to clean up the mess in the house. Appellant never objected to the plan. Henderson could tell by the expression on appellant's face that "she was all for it."

After testifying about the plan, Henderson then gave the following testimony regarding about what actually happened on the evening of Friday, July 16, 1982: According to Henderson, Staton and Castro arrived at the Wolfs' house at about 6:55 p.m. Staton came to the door of the house, while Castro remained in the car. At that time, appellant and Melanie, the small child, were sitting on the love seat, and Henderson went into the bedroom. While the record does not actually reflect whether Henderson and Wolf were visible to

---

1. Melanie was the minor child of Staton and appellant.

2. The testimony of several witnesses showed that it was Staton's habit to come to the Wolfs' house around 7:00 p.m. on Friday nights to pick up Melanie, a small child fathered by Staton during his marriage to appellant. These meet-

ings had apparently resulted in stormy sessions between appellant and Staton because the little girl was uncooperative and would cry when Staton attempted to take her away from home. The problems had already resulted in one court appearance, and it appears that further problems and court appearances were expected.

Staton, Henderson and Wolf were apparently hiding because Henderson testified that they had been "sneak(ing) around" to kill Staton. After Staton had entered the house, Wolf held the bar in his hand and walked down the hall and through Melanie's bedroom and into the living room.

Henderson followed Wolf into the living room, where Wolf repeatedly hit Staton with the bar in the back of the head. Appellant went to the back bedroom with Melanie. Henderson just "stood there" and watched Wolf beat Staton. Wolf then went outside. Henderson said he waited inside a few minutes and then went outside, where he saw Wolf in "the car" choking Castro. Wolf told Henderson to get the hammer from underneath the bushes and to hit Castro on the head. Henderson did what he was told. Wolf then went into the house, and Henderson followed about a minute later. Wolf then asked him to move Staton's car to the other side of the house so that nobody would see them carrying Staton's body to the car. Henderson, however, said he was scared and would not move the car, so Wolf went out and moved the car. Wolf and Henderson then carried the body out of the house and put it in the trunk of Staton's car. Wolf then went into the house, returned with a shotgun, and departed in Staton's car. Henderson followed him in Wolf's pick-up truck. After driving awhile, the two stopped their vehicles and disposed of Castro's body in a canal. After dragging the body down into the water, Wolf told Henderson to return to the car and to get the shotgun. When Henderson returned with the gun, Wolf told him to shoot Castro, and he did. Wolf and Henderson then drove to another location where Staton's body was dumped in a canal. They then disposed of Staton's car in a different canal. Wolf and Henderson then went to Henderson's house and cleaned blood off the gun and hammer.

Henderson later turned both the hammer and shotgun over to police. Both the hammer and shotgun were introduced as State's exhibits.

Bruce Casteel, a Texas Ranger, testified he was assigned to the case involving Staton. On July 27, 1982, in the course of his investigation, he spoke with appellant at her home. Appellant told Casteel that Staton never arrived at her house on July 16, 1982, to pick up Melanie. She said that she and Wolf waited but eventually took the child to appellant's mother's house.

Ranger Casteel reported that Staton's car was located on July 29, 1982. On August 6, 1982, Casteel spoke with Wolf, who at that time had agreed to confess to the murders. Wolf claimed that he and appellant had waited for Staton but eventually decided Staton was not coming. Wolf said that appellant took the child to her mother's and that, while he was driving to McAllen to return a video camera, he spotted Staton's car, and they both returned to Wolf's house. He said Staton became agitated when told that appellant had gone to her mother's with the child. Wolf and Staton argued, and Staton then attacked Wolf with a bar, Wolf explained that he ended up beating Staton in the head. Wolf said Castro, who had been in the car, apparently heard the fight and that she came inside and attacked him. He then hit her in the head with a hammer and killed her.

On the same day as that interview, but without Wolf's help, a private investigator, who was hired by the Staton family, located Castro's body.

Wolf, however, did lead the authorities to Staton's body. The body was lying in a canal in two or three inches of water, and it was badly decomposed. A search of the body revealed a Sony cassette tape recorder taped to Staton's stomach. The cassette tape was sent to the F.B.I. laboratory in Washington, D.C.[3]

Keith Sponholtz, a special agent with the F.B.I., explained to the jury how he examined the cassette tape forwarded to him by Texas authorities. As a forensic examiner in the field of magnetic tape analysis, Sponholtz explained that, when he received the tape recording, it was wound to the end of Side A and that a foreign substance, ap-

---

**3.** The tape was a recording of the sequence of events of the actual killing of Staton.

pearing to be mold, was inside the tape. Sponholtz made a "direct copy" of the tape, which is a copy made from the original without any processing, filters or any other type of adjustment to the actual recording. Sponholtz also made an "enhanced copy," which is a processed tape to make the voice information more intelligible.

Sponholtz also testified that he listened to the tape but that it was against F.B.I. policy to testify on the identity of voices because of the general unreliability of voiceprint analysis. He further explained that a voiceprint comparison could not be made on portions of the tape because its quality was so poor. Sponholtz later explained that, while no voiceprint analysis was available to link appellant to this tape, human ears might be able to identify recognizable characteristics on the tape and to identify the voices.

Joe Marchan, a chemist for the Texas Department of Public Safety, testified that he found human blood in the Wolfs' house. He found blood in the living room on three walls and the floor; a blood speck on the outside of the bathroom door which was Type A human blood; and, a blood speck on the front door which was human blood, but its type could not be determined. Other specks were found which could only be identified as blood, but no determination was made as to whether it was animal or human blood. Blood was also found on the curtains which was determined to be Type A human blood, Staton's blood type. "Quite a bit" of human blood had soaked through the living room carpet; however, red paint had been sprayed on the carpet which prevented typing the blood.

Marchan also tested the hammer, which had been allegedly involved in the murders, and found human blood on its side. Marchan further testified that a shotgun shell was found where Castro's body had been recovered. Shotgun pellets were removed from her clavicle area.

Dr. James Maher, a pathologist, testified that he did an autopsy on the body of Staton. The body was badly decomposed,

and various limbs were separated from the body. The skull was cracked across the top from one ear to the other, and a large portion of the skull was missing on the left side. Maher testified that at least three areas of the skull were traumatized at least once. Maher opined that the type of injury suffered by Staton indicated that his head was lying on a floor or pinned against a wall when the blows were delivered. The cause of death was innercranial injuries due to extensive skull fractures.

It was the State's theory that appellant's motive for killing Staton was related to her child custody disputes with her former husband. Several witnesses testified regarding the child custody disputes.

Staton's brother, Gilbert, testified that appellant had been married to Staton and that Melanie, a child from that marriage, had lived with appellant since the divorce. Gilbert also testified that certain difficulties arose between appellant and Staton regarding Staton's visitation rights. Staton's brother further testified that Staton, on advice of his attorney, had secured a tape recorder to secretly record the confrontations with his ex-wife and that Staton had recorded some of these meetings and had played the tapes for Gilbert.

Jerry Stapleton testified that he was a practicing attorney who represented Staton regarding visitation and custody problems. He explained that he had filed a motion to modify the original divorce decree which would have expanded Staton's visitation rights.

Kathy Lehman testified that, in May 1982, appellant had paid her and a friend $500.00 to beat up Staton. Lehman took appellant's money but never assaulted Staton.

Other witnesses were also called to show appellant's connection with Staton's death.

Leticia Castro's brother testified that, at about 6:00 p.m. on July 16, 1982, he was with Leticia and Staton and that they told him they were going to pick up Melanie.[4]

---

**4.** Although apparently hearsay, such statement was used to show Staton's purpose and intent to go to the Wolf house. *See People v. Alcalde,* 24 Cal.2d 177, 148 P.2d 627 (1944).

Rosa Galvan, a checker at an H.E.B. grocery store, testified that, on Saturday, July 17, 1982, she rented a vacuum cleaner to a person, whom she could not identify at trial, but that the person, to whom she rented the vacuum cleaner, was pregnant and Anglo and that the person signed a rental receipt as "Mrs. Sherry Wolf" and tendered a driver's license.[5] A copy of appellant's driver's license was admitted into evidence.

Kim Brady testified that she rented a house to appellant and her husband from February 1982 to July 21, 1982. According to Brady, she had no notice of the Wolfs' departure until July 21, 1982, five days after the murders, when Wolf returned the keys to her. Other testimony shows that the Wolfs inquired about another rental house on the morning of July 17, 1982, and moved into this other rental house on the same weekend.

The State then introduced the tape recording and recalled Henderson to identify the voices on the tape. A transcript, prepared beforehand by Henderson, was given to the jury and is set out herein in the appendix. Henderson testified that the phrase on the tape "Get him up, get him out of here, the front door. Now, hit him again" was spoken by appellant.

Margaret Staton, Staton's sister-in-law, testified that she had listened to the tape recording and that appellant said the phrase "Get him up, get him out of here, the front door. Now, hit him again."

Appellant called several witnesses. One of the witnesses testified that appellant's voice was on the tape recording and that appellant had admitted that she was present when Staton was attacked.

In her first two grounds of error, appellant challenges the sufficiency of the evidence to corroborate specific portions of the testimony of accomplice witness Glenn Henderson. Both grounds of error are based on the false premise that each isolated allegation or statement of the accomplice must be corroborated by "other evidence."

In Texas, the proper appellate standard of review for the sufficiency of corroborating evidence is that the testimony of an accomplice witness will not support a conviction unless it is corroborated by "other evidence tending to connect the defendant with the offense committed." TEX.CODE CRIM.PROC.ANN. art. 38.14 (Vernon 1966). This standard has been interpreted to mean that the non-accomplice evidence need not directly corroborate every element of the offense. Also, accomplice testimony may be corroborated by circumstantial evidence. As stated in *Paulus v. State*, 633 S.W.2d 827 (Tex.Crim. App.1982):

> As noted earlier, all the facts and circumstances in evidence may be looked to as furnishing the corroboration necessary. The corroborative evidence may be circumstantial or direct. Apparently insignificant circumstances sometimes afford the most satisfactory evidence of guilt and corroboration of the accomplice witness' testimony. It is not necessary that the corroboration directly link the accused to the crime or be sufficient in itself to establish guilt. The combined cumulative weight of the incriminating evidence furnished by the non-accomplice witnesses which tends to connect the accused with the commission of the offense supplies the test. Each case must be considered on its own facts and circumstances and on its own merits.

*Paulus v. State*, 633 S.W.2d at 846.

In the past, the Court of Criminal Appeals has rejected arguments similar to the appellant's arguments which would require the State to independently and directly corroborate every particular detail of the accomplice's testimony. *Edwards v. State*, 427 S.W.2d 629 (Tex.Crim.App.1968). The corroborating evidence need only make the accomplice testimony more likely than not.

**5.** Ranger Casteel testified that appellant was pregnant when he interviewed her on July 27, 1982.

*Warren v. State,* 514 S.W.2d 458 (Tex. Crim.App.1974).

■ Appellant first argues that it was necessary for the State to corroborate Henderson's testimony to the effect that he and Wolf acted together to commit the offense, citing *Granger v. State,* 605 S.W.2d 602 (Tex.Crim.App.1980), and *Fortenberry v. State,* 579 S.W.2d 482 (Tex.Crim.App.1979). Appellant, in essence, contends that the "other evidence" must corroborate not only the accused's involvement in the offense but must independently demonstrate a conspiracy between the accomplice witness and other accomplices. Neither *Granger* nor *Fortenberry* stand for this proposition. *Granger* holds that, in capital murder cases, the corroborative evidence is insufficient if it only corroborates the offense of murder. For the corroboration to be sufficient in a capital murder, the evidence must corroborate the defendant's involvement in the aggravated element which distinguishes murder from capital murder. The requirement of this additional corroboration is limited to capital murder cases. *See County v. State,* 668 S.W.2d 708 (Tex.Crim. App.1984). *Fortenberry* was reversed by the Court of Criminal Appeals because the trial court, despite a timely proper objection, failed to instruct the jury that additional corroboration is required in capital murder cases.

■ In the instant case, only the portion of the accomplice's testimony which inculpates appellant as a party to the offense requires corroboration, for that is the evidence upon which the conviction is based. That portion of the accomplice's testimony, which does not inculpate appellant, does not require corroboration. Therefore, Henderson's testimony that he and Wolf killed Staton which inculpates Henderson, and not appellant, requires no corroboration.

Appellant also argues that there was no evidence to corroborate Henderson's testimony that he personally committed an offense and suggests that the "other evidence" had to independently inculpate Henderson. Appellant's assertion is without merit.

■ In her second ground of error, appellant contends that the evidence is insufficient to corroborate Henderson's testimony that appellant knew about and participated in the plan to kill Staton. Appellant correctly cites *Tompkins v. State,* 501 S.W.2d 132 (Tex.Crim.App.1973) and *James v. State,* 538 S.W.2d 414 (Tex.Crim.App. 1976) for the proposition that the "other evidence" is insufficient to corroborate the accomplice testimony if it merely shows that an offense was committed but does not connect the accused to the commission of such offense. Appellant's contention is that the non-accomplice evidence shows that a murder was committed but that it fails to show appellant's connection with that crime, in spite of the fact, as conceded in appellant's brief, that she "disliked Billy as a result of a visitation dispute, that she was present in the house when he was beaten, that she rented a vacuum cleaner on the following day, that the house was cleaned and vacated, and that she gave false information to the Ranger Casteel when first questioned."

Appellant contends that this proof was insufficient and that the State had to additionally prove by non-accomplice testimony that appellant "knew the unlawful intent of Henderson and Paul (Wolf) prior to the commission of the offense." Appellant would have this Court hold that these corroborating factors show nothing more than her mere presence when the offense was committed and an attempt to conceal the crime. Appellant urges that, absent independent proof of her involvement with the offense prior to its commission, the evidence is insufficient to corroborate the accomplice testimony to this effect.

In support of her contention, appellant cites various cases holding that certain factors are insufficient to categorize one as a participant or accomplice in a crime. Appellant then argues that, since certain of these factors are present in this case, the evidence is therefore insufficient to corroborate the accomplice testimony. For example, appellant cites *Russell v. State,* 598 S.W.2d 238 (Tex.Crim.App.1980) which reiterates the well-established rule of law that

"mere presence at the scene of the offense does not compel the conclusion that the witness is an accomplice witness." *Russell v. State*, 598 S.W.2d 238 at 249. Appellant also cites *Easter v. State*, 536 S.W.2d 223 (Tex.Crim.App.1976) wherein it was held that "the mere fact that a witness denied knowledge of a crime does not make him or her an accomplice witness." *Easter v. State*, 536 S.W.2d at 225. Finally, appellant cites *Chambers v. State*, 630 S.W.2d 413 (Tex.App.—Houston [14th Dist.] 1982, no pet.), which notes the well-established rule that a witness is not an accomplice witness because he knew of a crime but failed to disclose or even concealed it. *Chambers v. State*, 630 S.W.2d at 417.

Appellant's position appears to be that her presence at the scene of the crime when Staton was killed and her false statements to Ranger Casteel are insufficient evidence to prove her to be an accomplice to the crime as a matter of law and that, therefore, this evidence is insufficient to corroborate Henderson's testimony that she was an accomplice. We disagree. The issue of what evidence is sufficient to make one an accomplice as a matter of law is a far cry from what evidence is sufficient to corroborate the testimony of a witness who incriminates the accused as a party to the offense.

■■■ For example, while mere presence of a witness at the scene is insufficient to make the accused an accomplice, the presence of the accused at the scene of the crime *may be* sufficient to corroborate the testimony of an accomplice. *See Graham v. State*, 643 S.W.2d 920 (Tex.Crim.App. 1983). *Passmore v. State*, 617 S.W.2d 682 (Tex.Crim.App.1981); *Infante v. State*, 612 S.W.2d 603 (Tex.Crim.App.1981). Additionally, while concealment of the offense is insufficient to make one an accomplice, suspicious conduct, such as flight after a crime, is sufficient to corroborate an accomplice's testimony. *Cawley v. State*, 166 Tex.Cr.R. 37, 310 S.W.2d 340 (1957). We refuse, however, to review the sufficiency of the corroboration by isolating various facts. This is not the proper appellate standard of review. *See Walker v. State*, 615 S.W.2d 728 (Tex.Crim.App.1981). In-stead, we view the non-accomplice evidence as a whole.

As noted under this same ground of error in appellant's brief, the State attempted to demonstrate appellant's active assistance through Henderson's testimony that it was appellant's voice on the tape saying, "Get him up, get him out of here, the front door. Now, hit him again." Appellant contends that, because Henderson is an accomplice witness, he cannot identify the appellant's voice and that Margaret Staton was unqualified to identify the voice because (1) she lacked sufficient familiarity with the appellant's voice and (2) the quality of the tape recording was poor. We disagree with appellant's contentions.

■■■ The tape recording was heard by the jury, and Henderson identified which statements were those of appellant. Henderson was clearly qualified to identify the voices on the tape. This evidence, like the remainder of his testimony, is probative if his testimony, as a whole, is corroborated by evidence tending to connect the accused to the commission of the offense.

Henderson testified that Wolf's, Staton's, and Melanie Staton's (the small child) voices, as well as appellant's own voice, could be heard on the tape. He attributed the various statements to the respective individuals. Another witness, Margaret Staton, Staton's sister-in-law, then testified that she knew appellant's voice and that the phrase, "Get him up, get him out of here, the front door. Now, hit him again," was said by appellant. Henderson's identification of the voices did not have to be specifically corroborated; however, the testimony of Margaret Staton corroborates the portion of Henderson's testimony identifying appellant's voice.

■■■ Appellant's assertion that Margaret Staton was unqualified to give an opinion as to the voices on the tape is without merit. In *Collins v. State*, 77 Tex. Cr.R. 156, 178 S.W. 345 (1915) it was said:

"Voice is a competent means of identification if the witness had any previous acquaintance with the person identified.

It is sufficient that the witness had heard such person's voice but once previous to the time in question."

*Collins v. State,* 178 S.W. at 355. The rule has continuing vitality. *See Norton v. State,* 564 S.W.2d 714 (Tex.Crim.App.1978); *Locke v. State,* 453 S.W.2d 484 (Tex.Crim. App.1970); *Schwartz v. State,* 158 Tex. Cr.R. 171, 246 S.W.2d 174 (1951). Margaret Staton testified that she had spoken to appellant on various occasions in the past and that she recognized the voice on the tape as belonging to appellant. It was therefore a question for the jury to decide the weight to be given Margaret Staton's testimony.

 Even if the State had offered no additional identification proof of the voices on the tape recording, Henderson's testimony that appellant was a party to the offense would have been sufficiently corroborated. Although appellant would have the entire case turn on whether the State adequately corroborated the voice identification, correct application of the appellate standard does not require us to focus on the voice identification alone. By her admission that she was present in the house when Staton was beaten, the additional factors corroborating her involvement which include her failure to disclose the crime to authorities, her active participation in misleading authorities investigating the crime and her rental of the vacuum cleaner, the accomplice testimony is sufficiently corroborated. Furthermore, appellant's admitted presence at the scene, coupled with the lack of outcry (as evidenced by the tape recording) at the time Staton was beaten, is sufficient evidence from which the jury could infer her involvement in the planning of the offense and, in itself, is evidence to corroborate the accomplice testimony. When all the above factors are considered together, the corroboration is overwhelmingly sufficient. Appellant's first two grounds of error are overruled.

In her third and fourth grounds of error, appellant contends that the evidence is insufficient to establish Staton's cause of death and that the trial court erred in not striking the pathologist's testimony because the body was not identified as Staton's.

The record shows that Dr. James Maher, the pathologist, testified, without objection, that he performed an autopsy on the body of Staton and that the cause of death was extensive head injuries, which were caused by more than one blow to the head. On cross-examination, Maher stated that Ranger Casteel told him the body was Staton's and that this was his only basis for identifying the body.

 Appellant argues that, since Dr. Maher did not know the deceased and was reliant upon what Ranger Casteel told him relative to the body's identity, the evidence is insufficient to show Staton's cause of death. We find no merit in the appellant's argument. Arguments such as these have been rejected in the past by the Court of Criminal Appeals. *See Hogan v. State,* 496 S.W.2d 594 (Tex.Crim.App.1973). Moreover, the record is clear that Wolf led Ranger Casteel to Staton's body and that, in turn, Casteel turned the body over to the pathologist. Furthermore, even if there had been no probative testimony from the pathologist, the evidence would have been sufficient to sustain the conviction, since under the existing Penal Code, it is not even required that a body be found to sustain a conviction for murder, if other testimony shows the cause of death. *See Williams v. State,* 629 S.W.2d 791 (Tex. App.—Dallas 1981, pet ref'd). In this case, Henderson's testimony is sufficient to show the cause of death. Appellant's third and fourth grounds of error are overruled.

In her fifth ground of error, appellant contends that the trial court reversibly erred in allowing Henderson to testify that Wolf told him that appellant had participated in planning the murder of Staton. Appellant contends that the use of Wolf's statements, which incriminate the appellant, is a violation of "the husband-wife privilege," citing TEX.CODE CRIM.PROC. ANN. art. 38.11 (Vernon 1979). We disagree.

Statements that are made by a spouse to a third party do not come within the privilege under Art. 38.11. *Stallings v. State,* 476 S.W.2d 679 (Tex.Crim.App.1972). Moreover, when a husband and wife are co-conspirators or when the evidence justifies such a conclusion by the jury, the declaration of one spouse is not privileged. *Goforth v. State,* 100 Tex.Cr.R. 442, 273 S.W. 845 (1925). Furthermore, statements made by a co-conspirator may be introduced into evidence when there is evidence outside of and independent of the statements which tends to establish the joint act of the parties. *See Denney v. State,* 558 S.W.2d 467 (Tex.Crim.App.1977). In this particular case, the State was required to show that a "joint act of the parties" existed between Wolf and appellant by evidence which, independent of Wolf's statements, incriminated appellant. The State met its burden through the testimony of Henderson, who testified to appellant's participation in the conspiracy. As noted earlier, Henderson's testimony was also corroborated by non-accomplice evidence. In order for Wolf's statements to be probative evidence, the State also had to prove that the statements made by Wolf to Henderson outside of the presence of appellant were made in furtherance of the conspiracy. *See Denney v. State,* 558 S.W.2d at 469. Wolf's statements to Henderson occurred before the commission of the murder and were made in the course of explaining to the third conspirator (Henderson) the parts of the plan which had already been formed. We hold that Wolf's statements, which incriminated appellant, were admissible as being in furtherance of the conspiracy. The "husband-wife" privilege was not violated. Appellant's fifth ground of error is overruled.

In her sixth ground of error, appellant alleges that the trial court erred in allowing the State to reopen the evidence after the State had rested and after appellant moved for an instructed verdict based on inadequate corroboration of the accomplice testimony. Again, appellant's contention is without merit. TEX.CODE CRIM. PROC.ANN. art. 36.02 (Vernon 1981) provides that the trial court "shall allow testimony to be introduced at any time before the argument of a cause is concluded, if it appears that it is necessary to a due administration of justice." As recently noted in *Cain v. State,* 666 S.W.2d 109 (Tex.Crim. App.1984), the decision to reopen a case is left to the sound discretion of the trial judge, even when the accused has previously moved for an instructed verdict. *See Boatright v. State,* 472 S.W.2d 765 (Tex. Crim.App.1971); *Cantu v. State,* 662 S.W.2d 455 (Tex.App.—Corpus Christi 1983, no pet.). We find that the trial court did not abuse its discretion in allowing the State to reopen its case. Appellant's sixth ground of error is overruled.

In her seventh ground of error, appellant contends that the trial court erred in permitting the prosecutor to comment on the appellant's failure to call Wolf as a witness. Appellant acknowledges that, generally, a prosecutor may comment on a defendant's failure to call witnesses, including the defendant's spouse. *See Ferrell v. State,* 429 S.W.2d 901 (Tex.Crim. App.1968). Appellant contends, however, that the rule may only be applied where the witness is available and competent but that, in this case, Wolf was unavailable to testify because he had a murder charge pending against him.

The State, for its part, argues that the prosecutor never commented on appellant's failure to call Wolf as a witness and quotes the argument:

"But if you do believe Mr. Bates and you accept what he's saying and you find Sherry Wolf not guilty what will be happening is that Sherry Wolf will have committed the perfect murder. Because of her, Ladies and Gentlemen—You've seen Glenn Wayne Henderson. You haven't seen Paul Wolf but you've seen Glenn Wayne Henderson. He's not real bright."

We agree with the State and need not decide whether the State could properly comment on appellant's failure to call Wolf as a witness. In cases involving an accused's failure to testify, before an appellate court will hold that a prosecutor's

statement is a comment on the defendant's failure to testify, the statement must be either manifestly intended or of such character that the jury would naturally and necessarily take it to be a comment on the defendant's failure to testify. *Davis v. State*, 670 S.W.2d 255 (Tex.Crim.App.1984). In reading the prosecutor's comment in light of the entire jury argument, we find that the prosecutor's comment was not one that the jury would naturally and necessarily take as a comment on Wolf's failure to testify. The prosecutor appeared to be arguing that the murder was so well-planned that an acquittal of appellant would result in "the perfect murder," an expression typically meaning the perpetrator successfully completed the crime without criminal liability. The argument was that Henderson, the accomplice, was not intelligent enough to plan and execute "the perfect murder." The prosecutor continued his argument, blaming appellant, not Henderson, for the pain and suffering of the victims' families. The statement simply was not one that is necessarily construed as someone's failure to testify. Appellant's seventh ground of error is overruled.

In her eighth ground of error, appellant contends that she was denied the effective assistance of counsel because her trial counsel had previously represented Staton in their divorce. Appellant argues that trial counsel was "burdened with a conflict of interest as a result of his representation of Billy Staton in the divorce case which led to the visitation problems which constituted the alleged motive for the murder." Appellant's court-appointed appellate counsel depicts appellant's retained trial counsel as a man who was unable to disassociate himself from emotional loyalties to his former client and family. Appellate counsel additionally contends that the trial court should have explained to appellant that the jury might "have a very unfavorable impression of a lawyer who would take money to represent a husband in a divorce, and then take additional money to represent his ex-wife who was accused of killing him."

In *Ferguson v. State*, 639 S.W.2d 307 (Tex.Crim.App.1982), the Court of Criminal Appeals, quoting from *Pollan v. State*, 612 S.W.2d 594 (Tex.Crim.App.1981), stated:

"In *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), the Supreme Court held that when no objection to an alleged conflict of interest is raised at trial the defendant must show an actual conflict which adversely affected his lawyer's performance. The mere showing of a possible conflict of interest is not sufficient to prevail on a claim of ineffective assistance of counsel."

*Ferguson v. State*, 639 S.W.2d at 310.

■ Appellant's arguments are based on the false assumption that an actual conflict of interest is shown on the record. We have reviewed the record and find only two references to appellant's trial counsel's prior involvement with Staton. One reference was made by Staton's last attorney, Jerry Stapleton, in response to a question by the State, that appellant's trial counsel had represented Staton in the divorce action.[6] The other reference is contained in a copy of the decree of divorce wherein appellant's trial counsel signed the decree as attorney for Staton. No further reference to trial counsel's former employment was placed before the jury or is mentioned in the record. Nothing in the record suggests that appellant's trial counsel had continuing professional responsibilities to Staton.

Unlike the cases cited by appellant, this case does not present a situation where an attorney divides his loyalty between two present clients or where the attorney has a continuing duty to his former client or where the attorney is financially pressured to work less than vigorously for the accused. The record neither supports appellate counsel's assertion that appellant's trial counsel had continuing loyalties or affection for Staton and his family nor does the record show that trial counsel was submissive at trial. Moreover, appellant *retained* Bates as her lawyer. She made no objec-

6. James Bates represented Staton in the divorce action. The divorce decree was signed and entered on April 3, 1980. Jerry Stapleton became Staton's attorney in the fall of 1981. The murder occurred on July 16, 1982, and trial commenced in July of 1983.

tion at trial about his representation. There is nothing in the record that suggests that appellant was unable to choose other trial counsel or was dissatisfied with the representation afforded her by Bates.

Appellant also contends that the record fails to demonstrate a waiver of the right to conflict-free counsel. Appellate counsel further contends that, "even though appellant obviously knew that trial counsel had represented Staton in the divorce," the record fails to show that she was aware that this created a conflict, that she realized the consequences of the conflict or that she was aware of her right to obtain other counsel. Appellate counsel then asserts that a new trial is required. We disagree.

▇ Appellate counsel is correct in pointing out that the records fail to demonstrate a waiver of the right to conflict-free counsel.[7] We conclude, however, that no waiver is necessary because no actual conflict has been demonstrated. It is axiomatic that, where no conflict of interest is shown, no waiver is required.

▇ The circumstances in this case raise only an issue of appellant's trial counsel's judgment in agreeing to represent an accused whose potential motive for the crime related to a case in which appellant's trial counsel had previously been involved as an adversary. We cannot speculate about possible conflicts of interest, and the circumstances of this case do not show an actual conflict as a matter of fact or law. As noted in *Pollan v. State*, 612 S.W.2d 594 (Tex.Crim.App.1981), the mere showing of a possible conflict of interest is not sufficient to prevail on a claim of ineffective assistance of counsel. Appellant's eighth ground of error is overruled.

We have carefully considered all of the record in light of all of appellants' grounds of error. Having found no reversible error, the judgment of the trial court is AFFIRMED.

> BS: Billy Staton
> PW: Paul Wolf

7. The right to conflict-free representation is guaranteed by the Sixth Amendment to the Constitution of the United States. *Glasser v. United*

SW: Sherry Wolf
MS: Melanie Staton
GWH: Glen Wayne Henderson

## APPENDIX

## TRANSCRIPTION OF BILLY STATON TAPE

### (AS IDENTIFIED BY GLENN HENDERSON)

MUSIC

BS: Um hm.

BS: I'll be back in a minute, hang on

WALKING

KNOCKING

PW: Come on in.

BS: Thank you.

BS: Hello little one.

MS: (Unintelligible)

BS: What ya doing?

MS: (Unintelligible) I'm not going.

BS: You want to go ride in the boat?

MS: No, I'm not going.

BS: No, yeah, you're gonna have to go with for, with us for a little while. We're gonna go out and go ride in the boat.

MS: (crying)

BS: And go swimming, don't you want to go play in the water ... hmm?

MS: (crying) No.

BS: You wanted to last week. How come you changed your mind? Hmm?

SW: You don't want to go?

MS: No.

SW: Why? Papa _____ to ride in the boat.

BS: Yeah, we'll go play ... in the water.

MS: I can't (unintelligible)

BS: (laugh) Yeah, the water feels so good. We'll go take some sandwiches and have a picnic.

MS: Yeah.

*States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

BS: Yeah, We'll have a lot of fun in the boat.

MS: Where's Letty?

BS: She's outside waiting for you. She's gonna go too.

MS: Oh _____ (Unintelligible)

BS: We'll be back.

MS: No. (Crying)

SW: Awh.

BS: We'll be back.

MS: (crying)

SW: Don't cry ... oh ... don't cry.

BS: We'll go play with the big inner tube ... don't you want to go play with the big inner tube again, hmm? Remember that big old black inner tube? (laugh) Hmm? In that, in that cold water.

MS: I want to see Kevin.

BS: Okay. Kevin's home this weekend, we can go see him.

MS: _____ with Baby Bosco...

BS: Well, Baby Bosco, he's at the beach.

MS: (unintelligible)

BS: Yeah.

MS: (unintelligible)

BS: You want to go see him and Kelly?

MS: (unintelligible)

BS: Okay, we might ride down there and go see him.

HITTING SOUNDS (TWO HITTING SOUNDS, BS: GROAN, THREE MORE HITTING SOUNDS)

MS: (crying and screaming)

PW: Get him. Get him, hurry up. (unintelligible)

GWH: You like ... (unintelligible)

BS: (Hard breathing) (Approximately four minutes later) Moaning.

PW: (unintelligible)

SW: Get him up, get him out of here, the front door. Now, hit him again.

BS: Moaning.

HITTING SOUNDS (five times) (radio in background)

_____: (unintelligible)

PW: Ah Glen, look at the fuckin' mess you made.

_____: (unintelligible)

PW: Get the car _____ here right now.

GWH: What about here? You go ahead, you know, I'm scared as shit.

SOUND OF CAR

_____: (unintelligible)

_____: (unintelligible)

PW: Honey.

PW: Help me drag him over.

PW: What's the matter, Glen?

BS: Gurgle.

APPROXIMATELY 10 MINUTES LATER

PW: "Go get the gun out of the car, Glenn."

SHOTGUN BLAST.

GWH: (unintelligible)

PW: (unintelligible)