COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-07-256-CR

 

 

MARSHALL MASHBURN II                                                     APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

             FROM
THE 16TH DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

Appellant Marshall Mashburn
II brings seven points challenging his conviction and life sentence for
murder.  We affirm.

Background[1]








In January 1999, a man doing
construction work found a femur and what he described as a long-handled red
knife at a site he was clearing in Lewisville, Texas near Interstate 35 and
Highway 407.  After he contacted the
police about his discovery, Dr. Dana Austin, a forensic anthropologist with the
Tarrant County Medical Examiner=s Office, and her team searched the area and found more remains.  They recovered about a third of a human
skeleton; a large piece from the back of the head was intact, but the rest was
in pieces.  Some of the bones had been
broken by the heavy equipment that had pushed them.  Dr. Austin determined that the remains were from
a white or Hispanic male between the ages of sixteen and twenty-three.  Dr. Austin=s team also found a Fila athletic shoe, a handle and blade from a
machete, a Dallas Cowboys football jersey, the waistband from a pair of what
were probably boxer shorts, and the remains of a pair of jeans or shorts. 

In January 2006, Lewisville
police contacted Dr. Austin to determine if the remains were those of Santino
Schraer, who had been missing since 1997. 
Orthodontic records and DNA testing showed that the remains were Schraer=s. 








Detective Richard Anders of
the Lewisville Police Department was part of the team that found Schraer=s remains.  He began
investigating Schraer=s disappearance
after receiving a phone call from Schraer=s mother in January 2006.  After
the remains found in 1999 were identified as Schraer=s, Detective Anders discovered that Schraer had been a suspect in a
1997 sexual assault of a twelve-year-old girl that had occurred at a motel
party in Lewisville.  The date of the
police report in that case was September 12, 1997, around the time Schraer disappeared.  From the report=s list of the names of persons at the party, Detective Anders located
Randy Horton, who claimed to be present with several persons, including
appellant, when Schraer was killed.  As a
result of Horton=s
information, the State charged appellant with Schraer=s murder by an indictment dated September 21, 2006.  Appellant was arrested in Love County,
Oklahoma on September 28, 2006. 

The indictment alleges that
appellant murdered Schraer by intentionally or knowingly causing Schraer=s death by striking him with a pipe or with an unknown object.  It also alleges that appellant committed the
offense of felony murderCby
committing an act clearly dangerous to human life by striking Schraer with a
pipe or an unknown object, with the intent to cause serious bodily injury.  On April 19, 2007, the State filed a motion
to amend the indictment, which the trial court granted on May 3, 2007.  The trial court ordered that the felony
murder counts of the indictment be amended to allege that appellant intended to
cause serious bodily injury to Schraer. 

After a four-day trial in
June 2007, a jury found appellant guilty of murder Aas alleged in the indictment,@ and sentenced him to confinement for life.  Appellant timely filed this appeal.  

 








Points on Appeal

In his first point, appellant
contends that he was denied the right to effective counsel during the
thirty-day period after his sentencing for filing a motion for new trial and
that this appeal should be abated to allow him time to file an out-of-time
motion for new trial.  In his second and
third points, appellant claims that the evidence is legally and factually
insufficient to support his conviction. 
Appellant=s fourth and
fifth points challenge the trial court=s refusal to submit lesser-included offense instructions on aggravated
assault and manslaughter.  In his sixth
point, appellant contends that the trial court erred by failing to instruct the
jury that accomplice testimony must be corroborated and by failing to define an
accomplice.  Finally, in his seventh
point, appellant complains about the trial court=s refusal to instruct the jury on sudden passion at punishment.

Right to Counsel At Critical
Stage of Proceeding

In his first point, appellant
claims that he was deprived of his right to counsel during the thirty-day
period for filing a motion for new trial.








The trial court sentenced
appellant on June 21, 2007.  Thereafter,
appellant=s trial
counsel filed a notice of appeal and motion for new trial.  Although both are filemarked July 9, 2007,
the certificate of service on the notice of appeal states that a copy was
mailed to the State on June 25, 2007, and the certificate of presentment states
that appellant=s trial
counsel hand delivered the motion for new trial to the trial court on June 25,
2007. 

On July 6, 2007, appellant
sent a handwritten letter to the trial court asking for a transcript of the
case so that he could proceed with an appeal. 
Accordingly, on July 9, 2007, the trial court appointed counsel for
appeal.  The trial court also denied the
motion for new trial that same day without holding a hearing.  On July 16, 2007, the notice of appointment
of appellate counsel was faxed back to the clerk with a note that the appointed
counsel was not at the fax number where the clerk had sent the notice.  Thereafter, on July 18, 2007, the trial court
appointed current appellate counsel. 

Appellant claims that he is
entitled to an abatement of this case so that he can file another motion for
new trial because the record shows that he was without counsel from at least
June 21 to July 9.  According to appellant,
the motion for new trial filed by trial counsel is inadequate because it was
not sworn, contains no affidavits, and sets forth only general arguments in
support of a new trial, such as that a new trial should be granted in the
interest of justice.  Thus, appellant
contends that the motion presented nothing for review and was filed solely to
extend the appellate deadlines. 








A defendant is entitled to
counsel during the period for filing a motion for new trial.  Cooks v. State, 240 S.W.3d 906, 911
(Tex. Crim. App. 2007);  Funk v. State,
188 S.W.3d 229, 231 (Tex. App.CFort Worth 2006, no pet.). 
Trial counsel, whether retained or appointed, has the duty to consult
with and to advise his client fully concerning the meaning and effect of the
trial court=s judgment,
the right to appeal from that judgment, and the necessity of giving notice of
appeal and taking other steps to pursue an appeal, as well as the duty to express
his professional judgment as to possible grounds for appeal and their merit,
and delineate the advantages and disadvantages of appeal.  Oldham v. State, 977 S.W.2d 354, 360B61 (Tex. Crim. App. 1998) (op. on reh=g), cert. denied, 525 U.S. 1181 (1999); Funk, 188 S.W.3d
at 231.  Accordingly, when trial counsel
does not withdraw and is not replaced by new counsel after sentencing, a
rebuttable presumption exists that trial counsel continued to represent the
defendant during the time for filing a motion for new trial.  Smith v. State, 17 S.W.3d 660, 662
(Tex. Crim. App. 2000); Oldham, 977 S.W.2d at 363; Funk, 188
S.W.3d at 231B32.








Here, the record shows that
trial counsel took steps to preserve appellant=s right to appeal by filing a timely notice of appeal and motion for
new trial and presenting the motion for new trial to the judge for a
ruling.  Thus, the record shows that
appellant was represented by counsel until at least June 25, 2007.  However, the record shows that although
appellate counsel was appointed for appellant July 9, 2007, appellant did not
receive the benefit of that counsel until the second attorney was appointed on
July 18, 2007, three days before the deadline for filing an amended motion for
new trial.  Additionally, counsel states
that he did not receive notice of the appointment until July 19 or 20.  Thus, it appears from the record that
appellant was not represented by counsel during at least part of the thirty-day
period for filing a motion for new trial.

Nevertheless, appellant has
failed to show that he was harmed by the gaps in representation.  See Cooks, 240 S.W.3d at 911B12.  Appellant does not say what
issues he would have raised on appeal that were not preserved by the motion for
new trial filed and presented by trial counsel, nor are any of the issues in
his brief barred from consideration by this court for lack of them being
properly raised in a motion for new trial. 
Thus, we conclude and hold that appellant is not entitled to abatement
of this case for the purpose of filing an additional motion for new trial.  See id. at 912.  We overrule appellant=s first point.

Legal and Factual Sufficiency
of Evidence








In his second and third
points, appellant contends that the evidence is legally and factually
insufficient to support his conviction for murder.  Specifically, appellant claims that the
evidence is insufficient to prove that his actions caused Schraer=s death, or that he was a party to the death, and that there is
insufficient evidence corroborating the testimony of appellant=s accomplices.

Standards of Review 

Legal Sufficiency

In reviewing the legal
sufficiency of the evidence to support a conviction, we view all the evidence
in the light most favorable to the prosecution in order to determine whether
any rational trier of fact could have found the essential elements of the crime
beyond a reasonable doubt.  Jackson v.
Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Clayton v. State,
235 S.W.3d 772, 778 (Tex. Crim. App. 2007).








This standard gives full play
to the responsibility of the trier of fact to resolve conflicts in the
testimony, to weigh the evidence, and to draw reasonable inferences from basic
facts to ultimate facts.  Jackson,
443 U.S. at 319, 99 S. Ct. at 2789; Clayton, 235 S.W.3d at 778.  The trier of fact is the sole judge of the
weight and credibility of the evidence.  See Tex. Code Crim. Proc. Ann. art. 38.04
(Vernon 1979); Margraves v. State, 34 S.W.3d 912, 919 (Tex. Crim. App.
2000).  Thus, when performing a legal
sufficiency review, we may not re-evaluate the weight and credibility of the
evidence and substitute our judgment for that of the fact-finder.  Dewberry v. State, 4 S.W.3d 735, 740
(Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131 (2000).  Instead, we Adetermine whether the necessary inferences are reasonable based upon
the combined and cumulative force of all the evidence when viewed in the light
most favorable to the verdict.@  Hooper v. State, 214
S.W.3d 9, 16B17 (Tex.
Crim. App. 2007).  We must presume that
the fact-finder resolved any conflicting inferences in favor of the prosecution
and defer to that resolution.  Jackson,
443 U.S. at 326, 99 S. Ct. at 2793; Clayton, 235 S.W.3d at 778.

The sufficiency of the
evidence should be measured by the elements of the offense as defined by the
hypothetically correct jury charge for the case.  Malik v. State, 953 S.W.2d 234, 240
(Tex. Crim. App. 1997); Bowden v. State, 166 S.W.3d 466, 470 (Tex. App.CFort Worth 2005, pet. ref=d).  Such a charge would be one
that accurately sets out the law, is authorized by the indictment, does not
unnecessarily restrict the State=s theories of liability, and adequately describes the particular
offense for which the defendant was tried. 
Gollihar v. State, 46 S.W.3d 243, 253 (Tex. Crim. App. 2001); Malik,
953 S.W.2d at 240.  The law as
authorized by the indictment means the statutory elements of the charged
offense as modified by the charging instrument. 
See Curry v. State, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000).

The standard of review is the
same for direct and circumstantial evidence cases.  Clayton, 235 S.W.3d at 778; Hooper,
214 S.W.3d at 13.

 








Factual Sufficiency

When reviewing the factual
sufficiency of the evidence to support a conviction, we view all the evidence
in a neutral light, favoring neither party. 
Watson v. State, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); Drichas
v. State, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005).  We then ask whether the evidence supporting
the conviction, although legally sufficient, is nevertheless so weak that the
fact-finder=s
determination is clearly wrong and manifestly unjust or whether conflicting
evidence so greatly outweighs the evidence supporting the conviction that the
fact-finder=s
determination is manifestly unjust.  Watson,
204 S.W.3d at 414B15, 417; Johnson
v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).  To reverse under the second ground, we must
determine, with some objective basis in the record, that the great weight and
preponderance of all the evidence, though legally sufficient, contradicts the verdict.  Watson, 204 S.W.3d at 417.








In determining whether the
evidence is factually insufficient to support a conviction that is nevertheless
supported by legally sufficient evidence, it is not enough that this court Aharbor a subjective level of reasonable doubt to overturn [the]
conviction.@  Id. 
We cannot conclude that a conviction is clearly wrong or manifestly
unjust simply because we would have decided differently than the jury or
because we disagree with the jury=s resolution of a conflict in the evidence.  Id. 
We may not simply substitute our judgment for the fact-finder=s.  Johnson, 23 S.W.3d at
12; Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  Unless the record clearly reveals that a
different result is appropriate, we must defer to the jury=s determination of the weight to be given contradictory testimonial
evidence because resolution of the conflict Aoften turns on an evaluation of credibility and demeanor, and those
jurors were in attendance when the testimony was delivered.@  Johnson, 23 S.W.3d at
8.  Thus, we must give due deference to
the fact-finder=s
determinations, Aparticularly
those determinations concerning the weight and credibility of the evidence.@  Id. at 9.

An opinion addressing factual
sufficiency must include a discussion of the most important and relevant
evidence that supports the appellant=s complaint on appeal.  Sims
v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).  Moreover, an opinion reversing and remanding
on factual insufficiency grounds must detail all the evidence and clearly state
why the finding in question is factually insufficient and under which
ground.  Goodman v. State, 66
S.W.3d 283, 287 (Tex. Crim. App. 2001); Johnson, 23 S.W.3d at 7.

Accomplice Witness Testimony

Article 38.14 of the code of
criminal of procedure provides that








[a]
conviction cannot be had upon the testimony of an accomplice unless
corroborated by other evidence tending to connect the defendant with the
offense committed; and the corroboration is not sufficient if it merely shows
the commission of the offense.








Tex. Code Crim. Proc.
Ann art. 38.14 (Vernon 2005).  In conducting a sufficiency review under the
accomplice-witness rule, the reviewing court must eliminate the accomplice
testimony from consideration and then examine the remaining portions of the
record to ascertain if there is any evidence that tends to connect the accused
with the commission of the crime.  Solomon
v. State, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001); Hernandez v. State,
939 S.W.2d 173, 176 (Tex. Crim. App. 1997). 
ATendency to connect@ rather than rational sufficiency is the standard:  the corroborating evidence need not be
sufficient by itself to establish guilt beyond a reasonable doubt.  Solomon, 49 S.W.3d at 361; Cathey
v. State, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999), cert. denied,
528 U.S. 1082 (2000).  Nor is it
necessary for the corroborating evidence to directly link the accused to the
commission of the offense.  Cathey,
992 S.W.2d at 462.  The
accomplice-witness rule is a statutorily imposed sufficiency review and is not
derived from federal or state constitutional principles that define the legal
and factual sufficiency standards.  Id.
at 462B63.  To satisfy the
accomplice-witness rule there simply needs to be other evidence tending to
connect the accused to the commission of the offense.  See id. at 463.








In determining whether a
person was an accomplice, courts may look to events before, during, and after
commission of the offense, including actions that show an understanding and
common design to do a certain act.  See
Kunkle v. State, 771 S.W.2d 435, 439 (Tex. Crim. App. 1986), cert.
denied, 492 U.S. 925 (1989).  To be
an accomplice witness, there must be some affirmative act on the witness=s part to assist in the commission of the offense.  Kutzner v. State, 994 S.W.2d 180, 187
(Tex. Crim. App. 1999.  In order to be an
accomplice as a matter of law, the person must be susceptible to prosecution
for the offense with which the accused is charged or a lesser included
offense.  See Medina v. State, 7
S.W.3d 633, 641 (Tex. Crim. App. 1999), cert. denied, 529 U.S. 1102
(2000); Ex parte Zepeda, 819 S.W.2d 874, 876 (Tex. Crim. App. 1991); Kunkle,
771 S.W.2d at 439.  A co‑indictee
for the same offense is an accomplice as a matter of law.  Burns v. State, 703 S.W.2d 649, 651
(Tex. Crim. App. 1985).  However, a
witness is not deemed an accomplice if he or she knew of the crime but failed
to disclose it or even concealed it.  Blake
v. State, 971 S.W.2d 451, 454 (Tex. Crim. App. 1998); Harris v. State,
738 S.W.2d 207, 215B16 (Tex.
Crim. App. 1986), cert. denied, 484 U.S. 872 (1987); Russell v. State,
598 S.W.2d 238, 249 (Tex. Crim. App.), cert. denied, 449 U.S. 1003
(1980).  Likewise, mere presence at a
crime scene does not make an individual an accomplice.  Cocke v. State, 201 S.W.3d 744, 748
(Tex. Crim. App. 2006), cert. denied, 127 S. Ct. 1832 (2007).

Applicable Facts

After appellant was indicted
and arrested in Oklahoma, Detective Anders and Texas Ranger Tracy Murphree went
to Oklahoma to interview him.  After
advising appellant of his Miranda rights, which he waived, the officers
questioned him about the night Schraer was killed.  Appellant first gave the officers an oral
statement in which he denied being in Texas at the time of Schraer=s death.  However, over the
course of about two hours of questioning, he later gave them a second oral
statement, which he then reduced to writing, as follows:

While at a party at a hotel, it was brought to my
attention by Randall Horton, a couple of days after, that [Schraer] had raped
his girlfriend=s
little sister.  He told me that he and
Jeff [Stealey] and Casey [Nelson] were going to confront him on it.

 

A few minutes later, [Schraer] came outside, and
we all confronted him on it.  When he
lied to us, we told him we=d kick his ass.  Then he made a comment about her, something
along the line of her asking for it.  So
I hit him.  Then we said we were going to
take him and get him away from here after we [whooped] his ass and that he
could never return to [this] house again or we=d
kick his ass again.

 








At that point, we took him to the truck and drove
off.  While going down the road, Randall
and Jeff were having more and more fun with it C
beating him.  At that point, I got
scared.  This was going too far, and that=s not
what I wanted to be a part of.

 

They got to this area of weeds off a highway and
drug him out.  At that point, I was so
scared I was trying everything to not pay attention to them.   But I could hear them laughing as I walked
around.  All I kept saying was, I want to
go home.  Then Randall grabbed my arm and
said, let=s
go.  They [stopped] somewhere, I guess to
wash the truck, and I started to walk off. 
Randall called me back over, and we left again.

 

The only thing I remember is Randall screaming in
my ear, Just shut up, don=t say
anything about this.  When we got back to
the house that night I packed my [clothes], I had there, and left.  The only time I saw any of them again was two
or three months ago I saw Casey and someone else I did not recognize.  Casey said someone was looking for me about
[Schraer], and I said, I don=t remember much, and last I
heard [Schraer] was gone, packed up, and left. 
At that point I walked away because I didn=t
want to go back through that night again. 

 

According to Detective Anders, this confession
was similar to the first story appellant had told him, but not the same.  

Detective Anders testified
that these events took place at Danny Smith=s house; Danny was around fourteen years old at the time, and all the
other kids went to his house because Anobody cared what went on there.@  Smith=s house was about fifteen minutes away from where the body was found. 








During the course of his
investigation, Detective Anders spoke with other persons there that night,
including Jeff Stealey and Casey Nelson. 
Each of them gave voluntary statements denying any knowledge of what
happened that night.  Detective Anders
also talked to Horton, Alisha GrammerCwho was Stealey=s girlfriend
at the time, and Robert Tedford, whose truck was used to take Schraer to the
field where his body was found.  After
speaking with all of these people, Detective Anders felt there was enough
information to charge only appellant, Stealey, and Nelson.  According to Detective Anders, the Lewisville
police did not charge Horton in Schraer=s death because the investigation showed that although Horton was in
the backyard when the incident started, he did not go in the truck with
appellant, Stealey, and Nelson, nor was he at the field where they dumped
Schraer. 

Grammer identified appellant
in a photo lineup as the person who struck Schraer in the head, either with a
pipe or baseball bat.  She did not
testify at trial, however.








Robert Tedford testified that
he stayed at Smith=s house
frequently in 1997 and that he often loaned his truck to Nelson, Horton, and
Stealey.  Tedford recalled that some of Athe guys@ had gotten
together to Atake issue
with [Schraer] . . . beat him up, whatever@ because they believed he sexually assaulted a twelve-year-old girl,
who was Horton=s girlfriend=s little sister.  Specifically,
they discussed beating him with poles and killing him.  Tedford could not remember whether appellant
was present during this discussion.  He
did remember that Nelson, Horton, Stealey, and Robbie Moss were there.  Tedford took issue with their plans because
he had been falsely accused of sexual assault in the past.  Tedford eventually left the backyard where everyone
was talking and went inside the house. 
He never saw Schraer that night or ever again.  The next day, everyone was acting strangely,
not talking about anything, and Nelson told Tedford what had happened.  Tedford found out the next day that his truck
had been used; it was clean, but he did not think that was unusual.  Tedford had known Schraer was dead since
1997.  When asked why he had not come
forward, he said he was scared because, in his words, AI know the people involved.  I
mean, they did it once, why wouldn=t they do it again?@  

Horton=s Version of Events

Randall Horton testified that
in September 1997, he was staying at Smith=s house.  Appellant had been
there a couple of times.  He was a
newcomer to the group; A[h]e wasn=t a regular.@  Horton was friends with Stealey and
Nelson.  








Horton testified that he was
at the party where Schraer had allegedly raped Horton=s girlfriend=s
sister.  At one point, Schraer was alone
in a room with her, but Horton did not know what had happened until a few days
later when his girlfriend told him what had happened.  She also told Stealey and Nelson.  Horton confirmed that the guys that Ahung out@ at Smith=s house talked about killing Schraer, A[j]ust, [t]ake him out, just beat him to death somewhere, leave him on
the side of the road.@  Horton said that he, Nelson, Stealey,
appellant, and Grammer were there and that appellant Awas pretty violent, pretty mad.@  According to Horton, appellant
said he had to Atake out@ Schraer and that he was so mad about the situation because appellant=s sister had been molested.  The
group talked about taking Schraer to a campground, chaining him to a campsite
there, and telling AD,@ a man with whom Schraer had fought a couple of times, where he
was.  There was also some discussion
about waiting to find out what happened, Abacking off.@  

The group did not see Schraer
until the next day.  He went to Grapevine
Lake with a group that included Horton, Nelson, and Stealey.  That night, Schraer was at Smith=s house with Athe same
people . . . [who] were hanging out together after the hotel party.@  For the most part, people
acted like nothing had ever happened.  At
one point, Stealey poured a beer down the side of Schraer=s head and said, AThis is for my dead homies.@  Horton did not think anything
of it because Ait was just
talk.@  








Horton said that at Smith=s house one night, Nelson said, AIf anything is going to be done, it=s got to happen right now.@  Horton, Nelson, Stealey,
Schraer, Grammer, and appellant were all there. 
At some point, appellant picked up a three-foot-long, black, metal pipe
that was against the fence and started swinging it like a baseball bat.  He Awalked over behind [Schraer] and then . . . walked back and forth a
couple of times.@  Appellant was swinging the pipe for about
fifteen or twenty minutes.  Then,
appellant walked back over toward Schraer; Nelson Anodded his head like a twitch, kind of,@ and appellant hit Schraer in the back of the head.  Schraer was seated at the time with his back
to appellant. 

According to Horton,
appellant swung the pipe hard, and A[y]ou could hear it hit.@  Schraer had his hands in front
of his body; said, AOh shit@; and hit his head on the table. 
Nelson then grabbed Schraer=s foot, dragged him by his feet through the backyard and alley, and
put him into the bed of the truck with appellant=s help.  Horton saw appellant in
the bed of the truck, and he saw Nelson get in the driver=s seat.  He saw Stealey grab the
handle of the passenger side door of the truck, but he never actually saw him
get in.  








Horton and Grammer walked
over to her car and got in.  They drove
to the campsite that had originally been suggested as a place to leave Schraer,
but they did not see anything there and did not go in.  Grammer took Horton back to Smith=s house, and appellant, Nelson, and Stealey showed up in the truck
fifteen or twenty minutes later.  They
told Horton they had taken Schraer to the side of the highway.  Appellant told Horton he had to keep hitting
Schraer to keep him from trying to get out of the truck.  When they pulled over to the side of the
road, the three took turns hitting Schraer; Stealey went last.  Stealey told Horton that before he hit
Schraer the last time, Schraer looked at him and said, AWhy are you doing this to me?@  According to Horton, Stealey
was angry but laughing, and appellant was calm, as if nothing had
happened.  

Horton said that Stealey and
Nelson told the group that if Aanything was said, . . . everybody goes down together.@  Appellant said he would do
whatever it took to stay out of prison. 
Horton was scared of the three because they said that if anybody told
what they knew, they would be killed. 
Horton saw blood in the driveway when the three returned.  Nelson and Stealey made Horton come with them
to wash the truck, but he did not see any blood in the truck or on the two
men.  Appellant stayed behind at the
house, and Horton never saw him again until trial.  Either the next day or a few days later,
Horton asked to see where they had left Schraer; Stealey took him to a place Aoff of 35 by Phil Dill Boats.@  He saw a body that was A[b]eat up pretty bad@ with the face caved in.  There
was a Cowboys jersey on it, which was what Schraer had been wearing the night
before.  








When Horton saw on television
that the police had found a body off of 407 and 35, he knew who it was.  But he did not talk to police about that
night=s events until 2006 when he was interviewed by Ranger Murphree and
Detective Anders.  He gave an initial
statement, and two days later he was arrested for a parole violation unrelated
to the case.  While he was in jail, he
gave a more detailed statement to Detective Anders. 

On cross-examination, Horton
testified that he had participated in the discussions about harming
Schraer.  In his initial statement to
police, he said that Nelson had nodded his head, no, when appellant was
swinging the pipe; however, at trial, he admitted that he was contending that
Nelson was encouraging appellant to hit Schraer, in contrast to his initial
statement.  Additionally, in his initial
statement, he said appellant had dragged Schraer to the truck; appellant testified
that his statement was incorrect in that respect.

Stealey=s Version of Events

        Stealey testified next, and told the jury
that the murder charges against him were pending and that the State had not
promised him anything for his testimony. 
Stealey testified that he attended the hotel party where Schraer had
allegedly raped the twelve-year-old girl; appellant and Nelson were not
there.  He confirmed that he heard about
the alleged rape after the party.  He
also confirmed that there was an informal gathering and discussion about it
where they discussed that Asomething [had] to be taken care of.@  Stealey took it to mean that
they were going to beat up Schraer.  








Stealey corroborated Horton=s testimony that appellant said his sister had been raped and no one
had done anything about it.  He and
Nelson, Horton, Schraer, Grammer, and appellant were in the backyard the night
appellant hit Schraer.  Schraer was
seated by himself at the table, and everyone else was standing around.  Appellant was behind a tree.  Stealey went to sit at the table, and
appellant shooed him away, so he moved. 
After that, appellant Acame charging out with a black pipe and struck [Schraer] in the back
of the head . . . . like he was trying to take his head off.@  According to Stealey, Schraer
never saw appellant; when he was hit, he said, AOh, and then the F word,@ and then his head hit the table. 

Schraer was completely
knocked out after appellant hit him. 
Stealey testified that Nelson dragged Schraer to the truck by the ankle
of his pants; appellant jumped into the back of the truck, Nelson hopped in the
front, and Stealey got in back with appellant. 
While they were driving away from Smith=s house, Schraer woke up, and appellant started hitting him again with
the pipe.  Appellant hit Schraer in the
back of the head and the middle of his back. 
Stealey said Schraer asked, AWhy are you doing this?@, while they were in the back of the truck.  








Appellant hit Schraer several
times in the back to prevent him from getting out of the truck.  At this point, Schraer=s face was covered in blood, Aand he was breathing real heavily and choking.@  They drove around for about
fifteen or twenty minutes.  At one point,
Stealey shoved Schraer away from him with his foot.  Appellant kept hitting Schraer, about fifteen
times.  Schraer was fighting for his
life.  Halfway through the ride,
appellant hit Schraer in the face with the butt end of the pipe.  When they arrived at the field, Schraer was
not breathing or making any noise.  His
face was Acompletely
smashed.@  They dumped his body out.  Appellant hit Schraer three or four more
times, and Stealey hit him twice with the pipe. 
They left appellant in the field covered with some brush.

The truck was full of blood,
so on the way back to Smith=s house, they drove the truck through a car wash on 407.  They then put the pipe in a trash can at a
convenience store.  Stealey recalls being
very emotional and horrified at what had happened.  Back at Smith=s house, he remembers there Abeing talk of we=re all going
to keep silent about this or join him.@  Stealey said that he never
said anything because he was scared of the people involved and of being taken
away from his family to go to prison.  He
corroborated Horton=s story
about looking at the body. 








On cross-examination, Stealey
admitted that he had received a letter from the State indicating that he had
agreed to cooperate with the State in exchange for some type of plea bargain,
but he did not know the terms of the plea bargain at the time of trial.  According to Stealey, appellant had told
Schraer on the way to the lake that he was going to have to kill him for
something Schraer had said and appellant was the person who had poured liquor
on Schraer, saying, AThis is for
my dead homies.@ 

Stealey admitted that with
regard to what happened that night, Ait gets down to his [appellant=s] word or [Stealey=s] word.@  Stealey agreed that appellant was enraged and
out of control, on a Areal
emotional high,@ when he was
beating Schraer in the back of the truck. 
He admitted hitting Schraer Apretty hard@ across the
front of his body after he had stopped moving and making noise.  He did not remember going to the car wash a
second time, but he remembers Horton telling him about a second car wash
because there was brain matter in the truck. 


Appellant=s Version of Events








After the State rested,
appellant testified.  Appellant was about
nineteen years old in September 1997. 
According to appellant, he was at the party where Schraer allegedly
raped the twelve-year-old girl. 
Everybody was either drinking, smoking marijuana, or doing other
drugs.  A couple of days after the party,
when he went to Smith=s house,
Stealey, Nelson, Horton, and Grammer were in the backyard and really
upset.  According to appellant, they were
ranting and raving.  When he asked what
had happened, they told him Schraer had raped the little sister of Horton=s girlfriend and they were discussing what they were going to do.  Randy and Grammer said they were going to Akick his butt,@ and Stealey
said Athat mother f=er is going
to pay.@

Appellant testified that the
rest of the group was talking about beating up Schraer, and he told them they
should confront him and find out what happened first.  According to appellant, someone then went to
get Schraer and sat him at the table. 
Appellant said that Grammer and Horton started screaming and yelling at
Schraer, calling him a Amolesting
piece of . . . S-H-I-T.@  Appellant testified that
Schraer at first denied their allegations, and Horton told Schraer they were
going to Abeat his ass@ if he did not start talking. 
Appellant said that he went along with it and started screaming and
yelling at Schraer.  When appellant asked
why he did it, Schraer answered, AThat little bitch had it coming. 
She deserved it.@  After that, appellant hit Schraer.  Appellant did not know what he hit Schraer
with, but he Ajust grabbed
something and hit him.@  He said he did not swing the object like a
bat, but he just hit Schraer after he said what he did.  








Appellant said that after he
hit Schraer, Schraer started to fight, and he and Nelson grabbed him and
dragged him to the truck.  Appellant
admitted that he and Stealey got in the back of the truck, and Nelson drove.  Appellant and Stealey held Schraer down in
the truck bed.  After a car drove up
behind them, appellant told Stealey they should just drop off Schraer and tell
him to get out of there, but Stealey told him no.  About that time, Schraer jumped up and
started swinging, and appellant=s reaction was to grab his legs. 
According to appellant, Stealey grabbed Schraer=s torso and body-slammed Schraer to the ground.  Appellant admitted to hitting Schraer a
couple of times in the face with his fists, but he said at that point, Stealey
grabbed the pipe and started hitting Schraer. 

Appellant testified that when
they got to the field, Stealey got Schraer out and kept hitting him with the
pipe while appellant just watched. 
According to appellant, Nelson asked what Stealey was doing because he
just thought they were going to beat up Schraer.  Appellant said he was going to leave and not
be a part Aof this@ anymore, and that at that point, Stealey threatened him with death if
he left.  Stealey then hit Schraer two or
three more times, Aand then the
last hit he did was a golf swing right across the side of his head.@  








Appellant testified that
Schraer was alive when he hit him in the face with his fists in the truck.  According to appellant, Stealey washed the
truck after they left the field.  When
they got back to Smith=s house,
Stealey told everyone that he would kill them if they told what had happened
because he had already killed once. 
Appellant said Stealey was bragging to everyone that he had Akilled [Schraer] with the pipe and how he had done a golf swing across
the side of his head.@  

Appellant admitted that he
initially lied when the police first questioned him about the murder, partly
because he Awas trying
[his] desperate best to not remember, and . . . [he] was scared to actually be
put in jail.@  He told them that Horton had been in the
truck because the event had happened a long time ago, and he was confused.  According to appellant, he only thought they
were going to Abeat
[Schraer] up, drop him by the highway, [and] tell him to get lost.@  However, he knew Schraer was
going to die Afrom being
beaten with that pipe.@  When he tried to walk away at the field, the
only thing on his mind was getting away from the situation.  








On cross-examination, the
State impeached appellant by pointing out that he had previously lied in a
hearing before the court by testifying that he asked for a lawyer but did not
get one when Ranger Murphree and Detective Anders first questioned him even
though the tape of the entire interview revealed that he did not make such a
request.  In addition, the State was able
to point out the inconsistency in appellant=s testimony that he would never forget such a traumatic event with his
explanation of why he kept leaving out details because he could not remember
them from ten years ago.  Although
appellant denied hitting Schraer to keep him in the back of the truck, he admitted
that Horton told the group that that is what had happened.  Although appellant agreed when the State said
that even if all he said was true he was still guilty under the law of parties,
appellant denied intending to kill Schraer; he said he only wanted to hurt him
and beat him up for raping a twelve-year-old girl. 

Medical Testimony

Dr. Austin had testified
earlier about the nature of the injuries that she deduced from Schraer=s remains.  According to Dr.
Austin, the base of the skull showed blunt force trauma occurring around the
time of death; in other words, it could not have been caused by the
construction equipment.  Dr. Austin
testified that the blow was significant, not a Alight tap.@  AIt would be a blow with some type of a weapon.  You know, it could be a board, it could be a
baseball bat. . . .  It would be
something that would be fairly heavy, and it would have been swung with
purpose, you know, with a purpose to hit someone hard.@  Dr. Austin also found indications
of multiple blows to the head, but because of the construction equipment that
had been used, she could not be sure what exactly caused that trauma. 








Dr. Mark Krauss, Deputy Chief
Medical Examiner in the District Medical Examiner=s Office in Fort Worth, also examined Schraer=s remains.  He testified about
the nature of the wound to the back of Schraer=s head.  According to Dr.
Krauss, there was a Acomplete
fracture, . . . depressed, shoved inward to the inner part of the skull.@  By a complete fracture, Dr.
Krauss meant that it went through the entire skull to the brain.  Dr. Krauss agreed that striking someone in
the head with a blunt object, such as a metal pipe, to the extent that such a
fracture resulted, would be an act clearly dangerous to human life.  He also testified that a blow to that part of
the head is especially dangerous because there are Aa couple of major arteries that run on the inside of the skull.@  According to Dr. Krauss,

If
you fracture the skull, it causes a shearing across that artery.  Most of the time it tears it and damages it
somehow.  If you get bleeding from that
artery, it very rapidly elevates the dura, the lining inside of the skull, and
starts pushing it away and causes a localized massive effect.  If you even get half of a golf ball worth of
hematoma there, it=s
potentially fatal.  If you get any bigger
than that, it is fatal.  

 

Dr. Krauss opined that the cause of Schraer=s death was blunt force trauma to the head and that the blow came from
Arelatively behind@ Schraer.  

Applicable Law

Penal code section 6.03
defines the intentional and knowing mental states as follows:

(a) A person acts intentionally, or with intent,
with respect to the nature of his conduct or to a result of his conduct when it
is his conscious objective or desire to engage in the conduct or cause the
result.

 








(b) A person
acts knowingly, or with knowledge, with respect to the nature of his conduct or
to circumstances surrounding his conduct when he is aware of the nature of his
conduct or that the circumstances exist. 
A person acts knowingly, or with knowledge, with respect to a result of
his conduct when he is aware that his conduct is reasonably certain to cause
the result.

Tex. Penal Code Ann. ' 6.03(a),
(b) (Vernon 2003).

Intent can be inferred from
the acts, words, and conduct of the accused. 
Patrick v. State, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995), cert.
denied, 517 U.S. 1106 (1996).  It can
also be inferred from the means used and the wounds inflicted.  Womble v. State, 618 S.W.2d 59, 64
(Tex. Crim. App. [Panel Op.] 1981); Yanez v. State, 199 S.W.3d 293, 311
(Tex. App.CCorpus
Christi 2006, pet. ref=d).  Intent may also be inferred from acts indicating
a consciousness of guilt.  See Claxton
v. State, 124 S.W.3d 761, 766 (Tex. App.CHouston [1st Dist.] 2003, pet. ref=d); cf. Montgomery v. State, 810 S.W.2d 372, 396 (Tex. Crim.
App. 1991) (op. on reh=g) (noting
that appellant=s intent to
arouse and gratify his own desire could be inferred by his consciousness of
wrongdoing, as evidenced by his telling children not to reveal to anyone what
had happened).

Analysis








Appellant contends that the
evidence shows that Schraer died from multiple blows and that there is no
showing that the one blow to Schraer=s head is what killed him. 
Additionally, appellant contends that there is insufficient
nonaccomplice evidence to prove that he intentionally or knowingly killed
Schraer.

Appellant admitted that he
hit Schraer with something from the backyard, and he admitted wanting to hurt
Schraer at the time.  He also admitted
that Schraer was sitting down when he hit him. Grammer, whom none of the men
implicated as being involved in the beating or activities afterward, identified
appellant as the one who initially hit Schraer. 
Dr. Krauss testified that the blow to the back of Schraer=s head was so deep, it depressed the skull all the way through to the
brain and that such a blow would have been sufficient to kill Schraer.  Appellant also admitted to assisting Stealey
in trying to keep Schraer in the back of the truck.

We conclude and hold that
there is both legally and factually sufficient nonaccomplice evidence to
support a conclusion that appellant intended to kill Schraer, as evidenced by
the nature of Schraer=s head
injury and the force that would have been needed to accomplish such an
injury.  Additionally, there is also
legally and factually sufficient nonaccomplice evidence to support a conclusion
that appellant intended to cause serious bodily injury to Schraer, and in the
course of doing so, committed an act clearly dangerous to human life.  Accordingly, we overrule appellant=s second and third points.

 








Alleged Jury Charge Error

In his fourth and fifth
points, appellant contends that the trial court erred by refusing to instruct
the jury on the lesser included offenses of aggravated assault and
manslaughter.  In his seventh point,
appellant claims the trial court erred by refusing to instruct the jury on
sudden passion at punishment.

The trial court need not
submit a lesser included instruction sua sponte if neither side requests
one.  See Delgado v. State, 235
S.W.3d 244, 249B50 (Tex.
Crim. App. 2007).  Moreover, the defense
may not claim error successfully on appeal due to the omission of a lesser
included offense if the defense did not request one.  Id. at 250.  Likewise, the trial court has no duty to sua
sponte instruct the jury on defensive issues, such as sudden passion.  Posey v. State, 966 S.W.2d 57, 61B62 (Tex. Crim. App. 1998); see Trevino v. State, 157 S.W.3d
818, 821B22 (Tex. App.CFort Worth
2005, no pet.) (explaining that sudden passion is defensive issue).

Here, neither appellant nor
the State requested instructions on aggravated assault, manslaughter, or sudden
passion.  Accordingly, the trial court
was not required to give these instructions to the jury sua sponte.  We overrule appellant=s fourth, fifth, and seventh points.

 

 








Lack of Accomplice
Instruction

In his sixth point, appellant
contends that the trial court erred by failing to include an instruction that a
conviction cannot be based on the testimony of an accomplice unless
corroborated by other evidence tending to connect the defendant with the offense.  See Tex.
Code Crim. Proc. Ann. art. 38.14 (Vernon 2005).  The State concedes that the charge should
have included such an instruction but that the omission of the instruction was
harmless.

Standard of Review

Appellate review of error in
a jury charge involves a two-step process. 
Abdnor v. State, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994).  Initially, we must determine whether error
occurred.  If so, we must then evaluate
whether sufficient harm resulted from the error to require reversal.  Id. at 731B32.

If there is error in the
court=s charge but the appellant did not object to it at trial, we must
decide whether the error was so egregious and created such harm that appellant did
not have a fair and impartial trialCin short, that Aegregious
harm@ has occurred.  Almanza v.
State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh=g); see Tex. Code Crim.
Proc. Ann. art. 36.19 (Vernon 2006); Hutch v. State, 922 S.W.2d
166, 171 (Tex. Crim. App. 1996).








In making this determination, Athe actual degree of harm must be assayed in light of the entire jury
charge, the state of the evidence, including the contested issues and weight of
probative evidence, the argument of counsel and any other relevant information
revealed by the record of the trial as a whole.@  Almanza, 686 S.W.2d at
171; see generally Hutch, 922 S.W.2d at 172B74.  The purpose of this review
is to illuminate the actual, not just theoretical, harm to the accused.  Almanza, 686 S.W.2d at 174.  Egregious harm is a difficult standard to
prove and must be determined on a case-by-case basis.  Ellison v. State, 86 S.W.3d 226, 227
(Tex. Crim. App. 2002); Hutch, 922 S.W.2d at 171.

Analysis

Nonaccomplice evidence can
render harmless a failure to submit an accomplice witness instruction by
fulfilling the purpose an accomplice witness instruction is designed to
serve.  Herron v. State, 86 S.W.3d
621, 632 (Tex. Crim. App. 2002).  A harmless
error analysis for the omission of an accomplice witness instruction should be
flexible, taking into account the existence and strength of any nonaccomplice
evidence and the applicable standard of harm. 
Id.  According to the court
of criminal appeals,








[i]n determining the strength of a particular
item of non‑accomplice evidence, we examine (1) its reliability or
believability and (2) the strength of its tendency to connect the defendant to
the crime.  Under Almanza v. State,
686 S.W.2d at 157 (Tex. Crim. App. 1984), the appropriate harm analysis depends
upon whether the defendant preserved error by bringing the improper omission to
the trial court's attention. . . . 
[W]hen the defendant has failed to preserve error, he must show egregious
harm. . . .

 

Under the egregious harm standard, the omission
of an accomplice witness instruction is generally harmless unless the
corroborating (non‑accomplice) evidence is Aso
unconvincing in fact as to render the State=s overall case for conviction
clearly and significantly less persuasive.@

 

Id. at 632.

Here, we have already
determined that sufficiently convincing nonaccomplice evidence corroborated the
accomplice testimony.  Thus, we conclude
and hold that the trial court=s failure to include an accomplice testimony instruction was harmless
in this case.  We overrule appellant=s sixth point.

Conclusion

Having overruled all of
appellant=s points on
appeal, we affirm the trial court=s judgment.

 

TERRIE LIVINGSTON

JUSTICE

 

PANEL: 
LIVINGSTON, DAUPHINOT, and HOLMAN, JJ.

PUBLISH

DELIVERED: 
August 7, 2008











[1]Because
appellant challenges the sufficiency of the evidence upon which he was
convicted, a more detailed description of the facts is included later in the
opinion.